James W. LEE, Plaintiff,

v.

UNITED STATES of America, Secretary of the Interior, Director, Bureau of Land Management, Eklutna, Inc., and Cook Inlet Region, Inc., Defendants.

Ralph A. EKLUND, Plaintiff,

v.

UNITED STATES of America, Secretary of the Interior, Director, Bureau of Land Management, Eklutna, Inc., and Cook Inlet Region, Inc., Defendants.

Cora CARR, Plaintiff,

v.

UNITED STATES of America, Secretary of the Interior, Director, Bureau of Land Management, Eklutna, Inc., and Cook Inlet Region, Inc., Defendants.

Nos. A79–336 Civil, A80–301 Civil and A82–411 Civil.

United States District Court, D. Alaska.

Jan. 23, 1985.

Rehearing Denied and Decision Amended Feb. 28, 1986.

Steven P. Oliver, Anchorage, Alaska, for plaintiffs.

Michael Spaan, U.S. Atty., Sue Ellen Tatter, Asst. U.S. Atty., Anchorage, Alaska, for Federal defendants.

John C. Siemers of Burr, Pease & Kurtz, Anchorage, Alaska, for defendant Eklutna, Inc.

David P. Frank of Roberts & Shefelman, Anchorage, Alaska, for defendant Cook Inlet Region, Inc.

## AMENDED OPINION

FITZGERALD, Chief Judge.

James Lee, Ralph Eklund, and Warren Carr staked out homestead claims during the late 1950s in the Eagle River Valley within the Municipality of Anchorage. They and their families have had a running battle ever since with the Bureau of Land Management (BLM) and assorted other parties concerning their rights to those lands. Lee, Eklund, and Cora Carr (Warren's widow) brought these consolidated actions in 1979–1982 under a variety of statutory and common-law theories, seeking to gain title to the disputed lands or to recover money damages for inverse condemnation. I hereby dismiss their actions, with the exception of a single claim raised by Lee,[1] for lack of subject-matter jurisdiction and for failure to state a claim on which relief can be granted.

## FACTUAL BACKGROUND

Lee, Eklund, and Carr staked out their disputed homestead claims in 1957, and filed notices of location with the BLM. In 1958–1959, BLM notified them by letter that significant portions of their homestead sites fell within federal Power Site Classification Number 399, established on March 29, 1950, and therefore were not available for private use or occupancy. The letters indicated that each individual could petition the Federal Power Commission (FPC) to restore the lands he sought to public entry, but noted that such a restoration would not confer upon him any preference rights in the lands.

When Lee, Eklund, and Carr petitioned the FPC for restoration of their lands, they were notified that the FPC had already made a determination under sec-

tion 24 of the Federal Power Act, 16 U.S.C. § 818 (1982), that the value of those lands as a power site would suffer "no injury" if opened to selection, entry, or location under the public land laws. Once this "no-injury" determination was made, the Secretary of the Interior was required to modify the power classification and restore the lands to public entry within a reasonable time, unless he identified some other basis for withdrawing them. See Reeves v. Andrus, 465 F.Supp. 1065, 1070 (D.Alaska 1979).

No restoration order was ever issued by the Secretary or BLM. In 1959, BLM rejected the homestead entries of Lee, Eklund, and Carr on the ground that they directly conflicted with the Power Site withdrawal. All three men were notified of their rights to appeal the decisions rejecting their entries to the Director of BLM. There is no record that any of them ever filed a formal appeal.

On March 15, 1961, BLM promulgated a notice that it was filing a platted survey covering the lands claimed by Lee, Eklund, and Carr. This notice was published in the Federal Register on March 23, 1961. See 26 Fed.Reg. 2486 (1961). The survey delineated the boundaries of Power Site Classification Number 399 in relation to the homestead sites selected by Lee, Eklund, and Carr, and was filed in the Anchorage BLM office on April 1, 1961. Soon after its publication, on April 27, 1961, the BLM issued final decisions rejecting the entries of Lee, Eklund, and Carr insofar as they conflicted with the Power Site withdrawal.[2]

Although the record indicates that the three men continued to object to these BLM decisions, and that Lee even retained legal counsel in 1963, they never won concessions from BLM concerning the lands within the Power Site Classification. All

---

1. Unlike Eklund and Carr, Lee has raised a claim against defendants Eklutna, Inc. and Cook Inlet Region, Inc. under section 14(c) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1613(c) (1982). Eklutna and Cook Inlet Region have moved for summary judgment on Lee's section 14(c) claim, but their motion was briefed separately and will be ruled upon by this court in a separate opinion.

2. The BLM vacated these final decisions on May 15, 1961 for the sole purpose of allowing a more precise redrawing of the conformance lines for each individual's homestead entry. The May 15, 1961 decision specifically provided that it was "not to be construed as granting any additional rights or concessions to the withdrawn lands as described in the original order of withdrawals."

three men signed compromise agreements with BLM by 1964, which enabled them to submit their proof of occupancy and to receive patent to those portions of their entries outside the Power Site withdrawal. They all filed amended homestead entry applications excluding the contested lands, and Eklund was even permitted to apply for an additional forty-acre parcel, for which he received patent in 1972, ostensibly in lieu of the excluded lands within his original claim.

The lands that Lee, Eklund, and Carr originally staked within Power Site Classification Number 399 remained under federal control until the 1970s. In 1974, the native village corporation of Eklutna, Inc. (Eklutna), organized pursuant to the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1641 (1982), filed a land selection application under ANCSA section 12, 43 U.S.C. § 1611, that included these disputed lands. In 1979, the United States issued a patent for the surface estate of these lands to Eklutna, and a corresponding patent for the subsurface estate to Cook Inlet Region, Inc. (Cook Inlet Region) as the native regional corporation in Eklutna's region. *See* 43 U.S.C. § 1613(f).

Lee, Eklund, and Carr's widow each brought actions (which this court consolidated) against the United States, the Secretary, the BLM Director, Eklutna, and Cook Inlet Region, seeking to acquire patent to these lands. They claim that the Secretary and BLM violated federal law by failing to open the Power Site withdrawal to homesteading after the FPC issued its "no-injury" determination. They further claim that the federal defendants intentionally misled them concerning the status of the lands and the procedures to be followed when they originally settled the area and attempted to secure title. They also claim that their rights to title have been preserved as against Eklutna and Cook Inlet

Region through ANCSA sections 14(g), 43 U.S.C. § 1613(g), and 22(b), 43 U.S.C. § 1621(b), as well as through the application of several common-law theories.

Lee, Eklund, and Carr contend that this court should order the defendants to issue them patents to the disputed lands under its federal-question, mandamus, quiet-title, and equity jurisdiction, as well as under jurisdiction derived from the Administrative Procedure Act (APA). The plaintiffs and defendants have all moved for summary judgment.[3]

## ANALYSIS

The threshold question in this action is whether this court has subject-matter jurisdiction over the plaintiffs' claims. In order to analyze this question properly, it is necessary to divide the plaintiffs' claims into three separate categories: 1) claims to acquire patent from the federal defendants; 2) claims to acquire patent from Eklutna and Cook Inlet Region; and 3) claims for money damages against the United States.[4] I conclude that the Quiet Title Act (QTA), 28 U.S.C. § 2409a (1982), bars this court from exercising jurisdiction over the plaintiffs' claims to acquire patent from the federal defendants. Moreover, I conclude that Congress' enactment of ANCSA preempts the plaintiffs' common-law claims against Eklutna and Cook Inlet Region, and conclude that ANCSA does not provide this court with subject-matter jurisdiction or authority to require Eklutna and Cook Inlet Region to issue patent to the plaintiffs. Finally, I conclude, based upon 28 U.S.C. §§ 1346(a)(2) and 1491 (1982), that this court lacks subject-matter jurisdiction over the plaintiffs' claims for money damages, although the United States Claims Court may have jurisdiction over those claims. Therefore, I dismiss the plaintiffs' actions.

**3.** As noted in footnote 1, the only claim of the plaintiffs not addressed in this decision is Lee's claim under ANCSA section 14(c), 43 U.S.C. § 1613(c).

**4.** After these motions for summary judgment were fully briefed, the plaintiffs moved to amend their complaints and add claims for money damages against the United States on an inverse condemnation theory.

## 1. *Claims to Acquire Patent From the Federal Defendants*

■ Despite the variety of legal theories they espouse, all but one of the plaintiffs' claims against the federal defendants are directed at a single objective: to secure patent for their disputed homestead entries and to quiet title for those lands in themselves.[5] The United States Supreme Court's decision in *Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), requires that all parties bringing actions against the United States seeking to secure or quiet title to land must satisfy the requirements of the QTA. Parties cannot circumvent the QTA's jurisdictional and procedural limitations by "artfully pleading" such actions under other statutory provisions or legal theories, or as challenges to federal administrative action under the APA. *Id.* at 284–86 and n. 22, 103 S.Ct. at 1818–19 and n. 22; *see South Delta Water Agency v. United States Department of Interior,* 767 F.2d 531, 541–42 (9th Cir.1985); *see also Nevada v. United States,* 731 F.2d 633, 636 (9th Cir.1984); *McIntyre v. United States,* 568 F.Supp. 1, 2 (D.Alaska 1983). Therefore, all the plaintiffs' claims against the federal defendants that are intended to secure patent to their disputed homestead entries—regardless of whether the plaintiffs have classified them as administrative appeals, mandamus actions, or suits in equity—must pass muster under the QTA.

When analyzed under the terms of the QTA, the plaintiffs' claims to secure patent from the federal defendants suffer from two fatal weaknesses. First, the United States formally disclaimed all interest in the disputed lands following their conveyance to Eklutna and Cook Inlet Region. Section 2409a(d) of the QTA provides that:

If the United States disclaims all interest in the real property or interest therein adverse to the plaintiff at any time prior to the actual commencement of the trial, which disclaimer is confirmed by order of the court, the jurisdiction of the district court shall cease unless it has jurisdiction of the civil action or suit on ground other than and independent of the authority conferred by section 1346(f) of this title [the section providing jurisdiction over QTA actions].

28 U.S.C. § 2409a(d).

■ Since the United States' conveyance of the disputed homestead property was required under the terms of ANCSA, there is no question that its disclaimer is valid and was made in good faith. Therefore, this court must confirm the United States' disclaimer of interest in the disputed lands. *See W.H. Pugh Coal Co. v. United States,* 418 F.Supp. 538, 539 (E.D. Wis.1976). Since no trial has yet commenced in this action, under the terms of section 2409a(d), this court's jurisdiction must cease over all the plaintiffs' claims to acquire patent from the federal defendants.[6]

■ Second, even without a disclaimer by the United States, the plaintiffs' actions to acquire patent would be barred by the QTA's twelve-year statute of limitations, contained in section 2409a(f):

Any civil action under the QTA shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(f). Since the QTA effects a limited waiver of the United States'

---

**5.** The sole exception is the plaintiffs' inverse condemnation claim against the United States, which seeks money damages.

**6.** The plaintiffs may attempt to argue that their administrative review and mandamus claims provide an alternative basis for this court to retain subject-matter jurisdiction, as required under section 2409a(d), but this argument runs directly contrary to the Supreme Court's analysis in *Block.* In *Block,* the Supreme Court held that any action against the United States designed to quiet title must satisfy *all* the requirements of the QTA. 461 U.S. at 284–86, 103 S.Ct. at 1818–19. This presumably includes the no-disclaimer requirement imposed by section 2409a(d).

sovereign immunity, its statute of limitations must be strictly construed and will not ordinarily be subject to equitable tolling. *California v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396–97 (9th Cir.1985); *Nevada*, 731 F.2d at 634; *see also Block*, 461 U.S. at 287, 103 S.Ct. at 1819–20; *McIntyre*, 568 F.Supp. at 4.

Under the terms of section 2409a(f), the QTA's twelve-year period of limitations began to run when Lee, Eklund, and Carr "knew or should have known of the claim of the United States" to the disputed lands. 28 U.S.C. § 2409a(f); *Guam v. United States*, 744 F.2d 699, 700 (9th Cir.1984). In determining this date, this court must employ a test of reasonableness. *Yuba Goldfields*, 752 F.2d at 396; *McIntyre*, 568 F.Supp. at 3. The statutory period began to run when the three men reasonably should have known that the United States had a conflicting claim to the lands they sought, regardless of how strong they believed that claim to be. *See Guam*, 744 F.2d at 701; *Nevada*, 731 F.2d at 635. "The existence of [even] one uncontroverted instance of notice [to each of the men], sufficed to trigger the limitations period." *Id.; see also Yuba Goldfields*, 752 F.2d at 396–97; *Guam*, 744 F.2d at 701.

Under this standard, Lee, Eklund, and Carr clearly should have realized by 1961 that the United States had a conflicting claim to the portions of their homestead entries within the Power Site Classification: that year the BLM issued its survey covering the disputed lands, published notice of the survey in the Federal Register, and issued final decisions rejecting their homestead entries. *See Yuba Goldfields*, 752 F.2d at 396–97; *Guam*, 744 F.2d at 701; *McIntyre*, 568 F.Supp. at 4. Moreover, by 1964, when the three men all reached signed compromise agreements with BLM and filed amended homestead entry applications in accordance with BLM's dictates, they indisputably knew of the United States' claim that the withdrawn land was not subject to entry under the public land laws. Even assuming that

the three men first learned of the government's position in 1964, their quiet title causes of action against the federal defendants all accrued well over twelve years before 1979, 1980, and 1982, when they and their successors filed the present actions. Therefore, the plaintiffs' claims to acquire patent from the federal defendants are all barred under the QTA's statute of limitations.

Based either upon the government's disclaimer or the QTA's statute of limitations, I must dismiss the plaintiffs' claims to acquire patent from the federal defendants for lack of subject-matter jurisdiction.

2. *Claims to Acquire Patent From Eklutna and Cook Inlet Region*

The plaintiffs have also brought claims against Eklutna and Cook Inlet Region, seeking title to the disputed lands under various common-law theories, including a constructive-trust theory, and under ANCSA sections 14(g), 43 U.S.C. § 1613(g), and 22(b), 43 U.S.C. § 1621(b). The QTA's twelve-year statute of limitations does not bar these claims, since under its plain terms, the QTA applies only to claims brought "to quiet title *against the United States*." 28 U.S.C. § 2409a (emphasis added). Congress passed the QTA as a limited waiver of sovereign immunity for actions to acquire title from the federal government, *see Block*, 461 U.S. at 287, 103 S.Ct. at 1819–20, not to insulate private parties who acquire federal lands, such as Eklutna and Cook Inlet Region, from bona fide actions to challenge their title. *See generally Economic Development and Industrial Corp.*, 720 F.2d 1, 4 (1st Cir.1983).

Nor does the QTA operate like an adverse possession statute and automatically provide Eklutna and Cook Inlet Region with valid title to the disputed lands as against the plaintiffs. The Supreme Court expressly indicated in *Block* that the QTA is merely jurisdictional and does not transfer title in disputed lands even to the United States:

Unlike an adverse possession provision, § 2409a(f) does not purpose to effectuate

a transfer of title. If a claimant has title to a disputed tract of land, he retains title even if his suit to quiet his title is deemed time-barred under § 2409a(f). A dismissal pursuant to §·2409a(f) does not quiet title to the property in the United States. The title dispute remains unresolved. Nothing prevents the claimant from continuing to assert his title.... *Block*, 461 U.S. at 291–92, 103 S.Ct. at 1822; *accord Economic Development and Industrial Corp.*, 720 F.2d at 4. Thus, the QTA did not divest the plaintiffs of whatever color of title they may have once possessed in the disputed lands. Since the QTA does not protect Eklutna and Cook Inlet Region from suit, the plaintiffs are free to assert their claims of ownership against those corporations insofar as other statutes and common-law principles permit.

■ The plaintiffs have raised several common-law claims against Eklutna and Cook Inlet Region, including a claim that the disputed lands were wrongfully withheld from them by the federal government, were wrongfully transferred to Eklutna and Cook Inlet Region under ANCSA, and thus are currently being held for them in a constructive trust by those corporations. To determine the extent to which common-law causes of action and remedies are available to individuals like the plaintiffs, who claim title to lands contained in ANCSA conveyances, it is necessary to examine the extent to which Congress "spoke directly" concerning such claims in ANCSA itself. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 313–19, 101 S.Ct. 1784, 1790–94, 68 L.Ed.2d 114 (1981); *see also Texas v. Pankey*, 441 F.2d 236, 241 (10th Cir.1971) (federal common law applies "[u]ntil the field has been made the subject of comprehensive legislation or authorized administrative standards"). "[W]hen Congress addresses a question previously governed by a decision rested on federal common law, the need for [application of common law] by federal courts disappears," *City of Milwaukee*, 451 U.S. at 314, 101 S.Ct. at 1791; moreover, "[t]he establishment of ... a self-consciously comprehensive program by Congress [for regulating a particular area]

strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *Id.* at 319, 101 S.Ct. at 1793.

ANCSA's language, structure, and legislative history indicate that Congress intended it to provide a comprehensive and final resolution of all issues relating to native land claims in Alaska. In enacting ANCSA, Congress declared that "the settlement [of those issues] should be accomplished *rapidly, with certainty, ... [and] without litigation.*" 43 U.S.C. § 1601(b) (emphasis added). Congress viewed ANCSA as constituting a complete and detailed *"settlement package,"* in which Alaska natives agreed to the extinguishment of all their claims based upon aboriginal title in exchange for fee title to more than 40 million acres and a cash settlement of about one billion dollars. H.Conf.Rep. No. 746, 92nd Cong. 1st Sess. 1, 34 (1971), U.S.Code Cong. & Admin.News 1971, p. 2192 (emphasis original); *see also United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1134 (9th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 113 (1980). In light of Congress' desire to provide a complete, final, and certain resolution of native land claims in ANCSA and to minimize the need for litigation, it seems unlikely that Congress would have authorized large-scale conveyances of lands to native corporations without carefully delineating the rights of other parties to assert claims to those lands. Allowing private parties to claim ownership to ANCSA-conveyance lands under a host of common-law theories would enable them to undermine the ANCSA settlement and to prevent native corporations from fully enjoying the fruits of the settlement for many years.

Moreover, Congress "spoke directly" in ANCSA concerning individuals' rights to assert claims to ANCSA-conveyance lands based on prior use and occupancy. At least four separate, detailed ANCSA provisions address and define these rights. *See* 43 U.S.C. §§ 1613(c)(1) (primary place of residence and business); 1613(g) (leases, contracts, rights-of-way, and easements);

1621(b) (homesteads, headquarters sites, trade and manufacturing sites, and small tract sites); 1621(c) (mining claims and locations). According to ANCSA's legislative history, Congress believed that "[a]ll valid existing rights [to ANCSA-conveyance lands], including inchoate rights of entrymen and mineral locators, are protected" under ANCSA's provisions. H.Conf. Rep. No. 746, at 37, U.S.Code Cong. & Admin.News 1971, at p. 2229. Congress plainly did not believe that common-law remedies would be necessary to supplement ANCSA in order to protect individuals' rights to ANCSA lands, or that parties should be permitted to assert claims to ANCSA-conveyance lands that were not expressly recognized in ANCSA.

■ Based on the detail with which ANCSA was drafted and Congress' intention to provide a certain and all-encompassing resolution of Alaska native land claims, I agree with the assessment of the United States Court of Claims in *Cape Fox Corp. v. United States*, 4 Cl.Ct. 223 (1983):

> The ANCSA is comprehensive. It sets out with particularity the rights of the United States, the natives, the State, and third parties, with respect to the lands and revenues to be distributed, and established a time frame in which these rights and duties are to attach.

■ Since Congress "spoke directly" in ANCSA concerning individuals' rights to assert claims to ANCSA-conveyance lands and established "a self-consciously comprehensive program" in ANCSA for determining such rights, I conclude, based upon *City of Milwaukee*, that Congress intended ANCSA to "occupy the field" in this area and to preempt any common-law theories or other statutory claims that individuals might assert. *See City of Milwaukee*, 451 U.S. at 314, 319, 101 S.Ct. at 1793–94. Given the extensive set of provisions in ANCSA delineating the rights of individual claimants to ANCSA-conveyance lands, any attempt to supplement these provisions with common-law remedies, such as the constructive-trust theory advanced by the plaintiffs, would represent an attempt to *alter* the comprehensive legislative scheme adopted by Congress in ANCSA, rather than to *"fill a gap "* that Congress has not occupied, and would therefore be an impermissible application of federal common law. *See id.* at 324 & n. 18, 101 S.Ct. at 1796 & n. 18. Thus, I dismiss the plaintiffs' common-law claims against Eklutna and Cook Inlet Region, and hold that the plaintiffs' claims seeking to recover title to the disputed lands from these corporations must be expressly based upon provisions contained in ANCSA.

The plaintiffs have brought claims against Eklutna and Cook Inlet Region under ANCSA sections 14(g), 43 U.S.C. § 1613(g), and 22(b), 43 U.S.C. § 1621(b). They claim that these ANCSA provisions preserve their rights to receive title to their disputed homestead entries as against the defendant native corporations. ANCSA section 22(b) provides that:

> The Secretary is directed to promptly issue patents to all persons who have made a lawful entry on the public lands in compliance with the public land laws *for the purpose of gaining title to homesteads,* headquarters sites, trade and manufacturing sites, or small tract sites ... and who have fulfilled all requirements of the law prerequisite to obtaining a patent. Any person who has made a lawful entry prior to August 31, 1971, for any of the foregoing purposes shall be protected in his right of use and occupancy until all the requirements of law for a patent have been met.... *Provided,* that occupancy must have been maintained in accordance with the appropriate public land law....

43 U.S.C. § 1621(b) (emphasis added).

ANCSA section 14(g) provides that:

> All conveyances made [to native corporations], pursuant to [ANCSA] shall be subject to valid existing rights. Where prior to patent of any land or minerals under [ANCSA], a *lease, contract, permit, right-of-way, or easement* (including a lease issued under section 6(g) of the Alaska Statehood Act) has been issued for the surface or minerals covered

under such patent, the patent shall contain provisions making it subject to the lease, contract, permit, right-of-way, or easement, and the right of the lessee, contractee, permittee, or grantee to the complete enjoyment of all rights, privileges, and benefits thereby granted to him.

43 U.S.C. § 1613(g) (emphasis added).

■ Based upon my analysis and comparison of the wording of these two provisions, I conclude that ANCSA section 22(b), and not section 14(g), was intended by Congress to protect the interests of individuals, like the plaintiffs, who claim ANCSA-conveyance lands based upon their prior entry and occupancy of those lands "for the purpose of gaining title to homesteads." The plain language of section 22(b) refers to "homesteads," "the public land laws," and "lawful entry"; in contrast, section 14(g) refers only to "lease[s], contract[s], permit[s], right[s]-of-way, [and] easement[s]." The two provisions thus address completely distinct sets of property interests and contractual rights established by the federal government: section 22(b) addresses those interests arising out of the operation of the public land law and four statutory programs in particular, whereas section 14(g) addresses those property interests and contractual rights that the federal government creates on a case-by-case basis through the "issu[ance]" of written authorizations and agreements.[7] There is no reason to believe that Congress intended section 14(g) to overlap with section 22(b) and to apply also to interests arising out of homestead entries, when section 14(g) does not mention the term "homestead," as section 22(b) does, and when section 14(g) appears to have been designed to cover a totally different set of property interests.

■ Moreover, a step-by-step analysis of the ANCSA conveyance process, including the Secretary's regulations for administering ANCSA conveyances, confirms that section 14(g) cannot be interpreted to overlap with section 22(b) and to apply to homestead entries. Under section 22(b), "[t]he Secretary is directed to *promptly* issue patents to all persons who have made a lawful entry on the public lands in compliance with the [homestead] laws ... and who have fulfilled all requirements of the law prerequisite to obtaining a patent"; he is also directed to "protect in [their] right of use and occupancy" all "person[s] who ha[ve] made a lawful entry prior to August 31, 1971" but who have not yet fulfilled all the homestead requirements. 43 U.S.C. § 1621(b) (emphasis added). Unlike other ANCSA provisions concerning individuals' prior existing claims to lands selected under ANCSA, including section 14(g), section 22(b) does not indicate that the lands to which it refers will ever be conveyed. *See, e.g.,* 43 U.S.C. § 1613(c)(1) (primary places of residence and business); 43 U.S.C. § 1613(g) (leases, contracts, permits, rights-of-way, and easements); 43 U.S.C. § 1621(c) (mining claims and locations). This omission, combined with Congress' use of the word "promptly," suggests that Congress intended section 22(b), unlike many parallel ANCSA provisions, to operate *prior to,* rather than following, any ANCSA conveyance: it requires the Secretary to assess the validity of potential claims that might be raised under the homestead laws *before* conveying lands involving such claims to native corporations.

This interpretation of section 22(b) as a *pre-conveyance* provision is supported by the Secretary's regulations, which provide that the Secretary will not transfer to a native corporation any lands for which he

---

**7.** At first glance, another distinction between section 22(b) and section 14(g) may appear to be that section 22(b) covers interests leading to acquisition of title, whereas section 14(g) does not. However, this distinction runs contrary to the Secretary's interpretation of the two provisions, which is that they both encompass at least some property interests that may eventually mature or develop into full-scale title. *See, e.g.,*

Secretarial Order No. 3016 and accompanying Memorandum, Valid Existing Rights Under the Alaska Native Claims Settlement Act, 85 Interior Dec. 1, 5–8 (1977). The correctness of the Secretary's interpretation is unnecessary to resolve for purposes of the present case, and I only conclude now that Congress did not intend to include homestead entries as property interests protected by section 14(g).

determines that valid homestead entries have been made:

> Pursuant to sections 14(g) and 22(b) of the act, *all conveyances issued under the act shall exclude any lawful entries which have perfected under, or are being maintained* in compliance with, laws leading *to the acquisition of title,* but shall include lands subject to valid existing rights of a temporary or limited nature such as those created by leases (including leases issued under section 6(g) of the Alaska Statehood Act), contracts, permits, rights-of-way, or easements.

43 CFR § 2650.3–1(a) (emphasis added). Since the Secretary is required under section 22(b) to assess the validity of all potential homestead claims, and is also required under his own regulations to exclude from any ANCSA conveyances those homestead claims determined to be valid, it is clear that he must make the homestead evaluations required under section 22(b) *prior* to making any ANCSA conveyances.

In contrast to section 22(b), section 14(g) is by its very terms a *post-conveyance* provision: it imposes obligations upon native corporations that take effect only once they receive conveyances of lands that are subject to "valid existing rights." *See* 43 U.S.C. § 1613(g). Since under section 22(b) and 43 CFR § 2650.3–1(a), the validity of all homestead-related claims is supposed to be resolved by the Secretary prior to any ANCSA conveyance, and since in theory, no conveyance is supposed to include valid homestead entries, Congress could not have intended section 14(g) to apply to homestead-related claims. Under the ANCSA conveyance process, any "valid" homestead claim will be segregated by the Secretary before it can be conveyed, and will never reach the native corporations. Conversely, any purported homestead claim contained in an ANCSA conveyance will presumably already have been determined

invalid by the Secretary. Thus, it would be anomalous for a native corporation to conclude that a homestead claim within a conveyance it receives is a "valid existing right" entitled to protection under section 14(g). As a result, section 14(g) cannot apply to claims based on the homestead laws.

Congress appears to have had several strong reasons for choosing to address claims under the homestead laws in a separate provision from claims involving the property and contractual interests enumerated in section 14(g), and for choosing to require the *Secretary* to assess the validity of all homestead claims *prior to conveyance,* rather than requiring *native corporations* to perform this function *following conveyance,* as it did with the section 14(g) property interests. First, the Secretary is better equipped than the individual native corporations to assess the validity of homestead claims, because of his expertise concerning the intricacies of public land law, his access to records concerning various claims, and his prior dealings with various entrymen. It would create an unnecessary burden on native corporations' time and resources to require them to accumulate this same information and expertise.

Second, if lands subject to homestead claims were included in ANCSA conveyances to native corporations, those lands would presumably be counted as part of the corporations' total ANCSA lands entitlement. Since the corporations would then have to relinquish all valid homestead entries without receiving any compensating benefit, they would effectively be deprived of part of the total benefits to which ANCSA entitled them. In contrast, the property and contractual interests which section 14(g) requires the native corporations to administer are all revenue-generating: when the lands subject to section 14(g) leases, permits, options to purchase,[8] or other inter-

---

**8.** The Secretary has concluded that certain options to purchase constitute "valid existing rights" under section 14(g). Secretarial Order No. 3016 and accompanying Memorandum, Valid Existing Rights Under the Alaska Native Claims Settlement Act, 85 Interior Dec. 1, 7–8

(1977). I merely cite options to purchase as an example of a *possible* section 14(g) property interest in this context, and do not mean to imply any decision at this point as to whether such options are covered under the terms of section 14(g).

ests are turned over to native corporations, the corporations will ultimately either retain control of these lands or at least receive some rent or income in return. *See generally* Secretarial Order No. 3016 and accompanying memorandum, Valid Existing Rights Under the Alaska Native Claims Settlement Act, 85 Interior Dec. 1, 8. Thus, treating homestead claims differently from section 14(g) claims and requiring the Secretary to exclude any valid homestead claims from ANCSA conveyances can be viewed as an attempt by Congress to ensure that native corporations receive their full lands entitlements under ANCSA. Furthermore, requiring the Secretary, as opposed to the native corporations, to make the final determinations concerning the validity of all homestead claims is especially appropriate, given the direct economic stake that native corporations would have in rejecting homestead claims so that they would be entitled to retain the lands being claimed.[9]

■ Based on this analysis, I dismiss the plaintiffs' claims against Eklutna and Cook Inlet Region under ANCSA sections 14(g) and 22(b). The claims by Lee, Eklund, and Carr to the disputed lands are all exclusively premised upon compliance with the homestead laws: all three individuals claim to have originally entered and occupied the contested lands "for the purpose of gaining title to homesteads." *See* 43 U.S.C. § 1621(b). None of the three plaintiffs' claims are based upon any of the property interests enumerated in section 14(g). As a result, the plaintiffs have failed to state a claim for which relief can be granted under section 14(g), and I must dismiss their section 14(g) claims. *See* Fed. R.Civ.P. 12(b)(6).

■ I dismiss the plaintiffs' section 22(b) claims against Eklutna and Cook Inlet Region for lack of subject-matter jurisdiction. By its plain terms, section 22(b) establishes a duty only on the part of the Secretary to issue patents to individuals with valid homestead claims. It does not establish any duty on the part of native corporations to individuals claiming lands based on the homestead laws: as indicated above, Congress did not intend for native corporations to be involved in evaluating the validity of such claims, or to convey any of the lands they receive under ANCSA to those raising such claims. *See* 43 U.S.C. § 1621(b). As a result, the plaintiffs cannot bring any claims against the defendant native corporations under section 22(b).[10]

■ The only defendant that the plaintiffs could conceivably sue based upon section 22(b) is the Secretary. *See id.* However, section 22(b) does not itself contain a waiver of the federal government's sovereign immunity, or provide any mechanism for parties, like the plaintiffs, to obtain administrative or judicial review of the Secretary's determinations under that provision. Therefore, any action that the plaintiffs bring against the Secretary based upon section 22(b) that is designed to acquire patent to the contested lands would have to be brought under the QTA. *See Block*, 461 U.S. at 286 and n. 22, 103 S.Ct. at 1819 n. 22 (holding that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property," and that parties claiming title to lands held by the federal government cannot bring actions under the APA). Since

---

9. It should be noted, however, that Congress did not structure all of ANCSA's provisions in order to avoid having native corporations determine the validity of claims to lands that they might consider economically valuable. *See, e.g.,* 43 U.S.C. § 1613(c)(1).

10. Although I dismiss the plaintiffs' common-law and section 22(b) claims against Eklutna

and Cook Inlet Region for lack of subject-matter jurisdiction, Eklutna has requested that I nevertheless make complete findings of fact on these claims in case the Court of Appeals disagrees with my jurisdictional analysis. Such findings would be purely advisory in light of my conclusions concerning this court's jurisdiction, and I therefore decline to make such findings.

the plaintiffs' claims to acquire title to the disputed lands from the government were already barred under the QTA's twelve-year statute of limitations before the Secretary made his section 22(b) determination, *see* section 1, *supra,* I conclude that any claims by them seeking title based on his section 22(b) determination are also time-barred.[11]

### 3. *Inverse Condemnation Claims Against the United States*

■ Lee, Eklund, and Carr have also brought inverse condemnation claims against the United States, alleging a "taking" of their property without just compensation. They contend that prior to the Secretary's conveyance of the contested lands to Eklutna and Cook Inlet Region, they had property rights in those lands that remained intact despite the bar of the QTA.

*See generally Block,* 461 U.S. at 291–92, 103 S.Ct. at 1822. According to the plaintiffs, by conveying those lands under ANCSA to the defendant native corporations, who cannot be sued for title under ANCSA's provisions, the Secretary effectively extinguished their property rights. It is these property rights for which the plaintiffs have brought inverse condemnation claims. *See generally Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 2328–32, 81 L.Ed.2d 186 (1984) (holding that eminent domain power may be used to implement land redistribution program).

Each plaintiff is seeking "in excess of $10,000" in money damages on their inverse condemnation claims. The United States Claims Court has exclusive jurisdiction over actions for money damages against the United States when the amount sought is greater than $10,000. 28 U.S.C.

---

11. I conclude that section 22(b) does not extend the period of limitations for individuals like the plaintiffs, whose time for initiating actions has already elapsed under the QTA. Section 22(b) does not expand the rights of the plaintiffs in the disputed lands beyond those they had in 1961–1964, when their QTA causes of action accrued. *See* section 1, *supra.* Therefore, the plaintiffs cannot contend that the QTA's twelve-year period started over again when the Secretary made his section 22(b) determination in the late 1970s. *See Yuba Goldfields,* 752 F.2d at 396–97 (QTA's twelve-year period begins to run when parties *first* become aware that the United States may assert a claim to lands they are claiming); *Guam,* 744 F.2d at 700–01 (same); *Nevada,* 731 F.2d at 635 (same).

The plaintiffs may contend that their actions raise timely section 22(b) claims based on ANCSA's limitations provision for challenges to decisions made by the Secretary, 43 U.S.C. § 1632(a) (1982). Section 1632(a) provides that: "a decision of the Secretary under ... the Alaska Native Claims Settlement Act shall not be subject to judicial review unless such action is initiated before a court of competent jurisdiction within two years after the day the Secretary's decision becomes final or December 2, 1980, whichever is later: *Provided,* that the party seeking such review shall first exhaust any administrative appeal rights." *Id.*

The negative phrasing of section 1632(a) ("shall *not* be subject to judicial review *unless* ...") and its reference to "court[s] of *competent jurisdiction* " indicate that it was not intended

by Congress to *create* jurisdiction over parties' claims based on ANCSA or to *expand* the remedies available to parties beyond those already available. under other provisions. Moreover, section 1632(a)'s legislative history confirms that it was adopted to *limit,* rather than extend, the time for judicial review: Congress noted that "[d]ue to the interwoven nature of entitlements, decisions, and conveyances concerning land under ... ANCSA, it is desirous that administrative decisions be absolutely final in minimum periods of time." S.Rep. No. 413, 96th Cong., 2d Sess. 291 (1980), *reprinted in* 1980 U.S.Code Cong.Ad.News 5070, 5235. Congress did not envision the provision as authorizing judicial review in cases where it was not already available, but instead stated that "[t]his section provides that judicial review be instituted, *if at all,* within two years of the date a Secretarial decision becomes effective." *Id.* at 291–93, *reprinted in* 1980 U.S.Code Cong. and Ad.News at 5235–36 (emphasis added). Thus, because at the time of the Secretary's section 22(b) decision, the QTA barred any challenge to that decision, section 1632(a) does not create an independent basis for jurisdiction over such a challenge.

I note in passing also that section 1632(a) requires that parties "exhaust any administrative appeal rights" before seeking judicial review of Secretarial decisions under ANCSA. 43 U.S.C. § 1632(a). The record indicates that of the three plaintiffs, only Lee can arguably be deemed to have exhausted his administrative appeal rights regarding his section 22(b) claims.

§§ 1491, 1346(a)(2) (1982); *Cape Fox Corp. v. United States*, 646 F.2d 399, 401–02 (9th Cir.1981). Therefore, I must dismiss the plaintiffs' inverse condemnation claims for lack of subject-matter jurisdiction.[12]

WHEREFORE, IT IS ORDERED THAT:

1) the plaintiffs' claims for patent against the federal defendants are dismissed for lack of subject-matter jurisdiction;

2) the plaintiffs' common-law claims for patent against defendants Eklutna and Cook Inlet Region are dismissed for lack of subject-matter jurisdiction;

3) the plaintiffs' claims for patent against defendants Eklutna and Cook Inlet Region under ANCSA section 14(g) are dismissed for failure to state a claim upon which relief can be granted, and their claims under ANCSA section 22(b) are dismissed for lack of subject-matter jurisdiction; and

4) the plaintiffs' inverse condemnation claims against the United States are dismissed for lack of subject-matter jurisdiction.

---

**12.** Despite the fact that this court lacks subject-matter jurisdiction over the plaintiffs' inverse condemnation claims, the federal defendants have requested me to make findings of fact that could be used by the Claims Court in any subsequent action there. However, such findings would be purely advisory and would undermine the exclusive jurisdiction of the Claims Court over the plaintiffs' inverse condemnation claims. *See Cape Fox Corp. v. United States*, 646 F.2d 399, 402 (9th Cir.1981). Therefore, I decline to make such findings.