## UNITED STATES v. NORTON.

Circuit Court of Appeals, Fifth Circuit.
June 9, 1927.

No. 4966.

1. **Public lands** ☞35(5)—**Settler held without right to perfect homestead entry on lands reserved, and later restored and reserved for town-site purposes (Comp. St. §§ 4530a, 4538, 4784, 4785).**

Where defendant occupied land withdrawn from public domain and reserved for Coast Guard purposes, and after release by executive order of part of such land, and its restoration to public domain, subject to the public land laws and to the jurisdiction of the Department of the Interior, moved his · dwelling on the portion so released, and unsuccessfully filed homestead application, which was rejected on suggestion of Commissioner of Land Office that lands were valuable as town lots, and where the President thereafter by executive order reserved such land for town-site purposes, and public sale of lots was held after survey, held, in subsequent action of ejectment by the United States, defendant had no rights under Act May 14, 1880, § 3 (Comp. St. § 4538), relating to rights of settler on public land later open to homestead entry, in view of Joint Resolution Feb. 14, 1920 (Comp. St. § 4530a), and Rev. St. §§ 2380, 2381 (Comp. St. §§ 4784, 4785), and fact that lands were never opened to homestead entry.

2. **Public lands** ⏤35(5)—**Settlement on public land gives settler no right, but only preference, if land is opened to entry (Comp. St. § 4538).**

Under Act May 14, 1880, § 3 (Comp. St. § 4538), settlement on public lands, with intent to claim homestead, does not confer on settler any vested right in the land, but only gives him a preference over others, in the event that the land is thrown open to entry, and does not deprive government of right to dispose of land otherwise than under preemption or homestead laws, or to appropriate it to any public use.

3. **Public lands** ⏤39(1)—**Executive order reserving land for town site imports finding land was such as could be reserved (Comp. St. § 4784).**

Under Rev. St. § 2380 (Comp. St. § 4784), executive order reserving land for town-site purposes imports a finding by the President that the land reserved was such public land as President was authorized to reserve.

4. **Public lands** ⏤39(1)—**President's finding public lands are such as may be reserved for town site is conclusive, in absence of fraud (Comp. St. § 4784).**

Finding by President that land reserved for town-site purposes, under Rev. St. § 2380 (Comp. St. § 4784), was land such as he was authorized to reserve, is conclusive on courts, in the absence of fraud or imposition.

5. **Public lands** ⏤31—**Occupant of public land without right may be ejected at suit of government.**

An occupant of public land, who has acquired no right to remain in possession of it, is subject to be ejected therefrom at suit of government.

Appeal from the District Court of the United States for the Southern District of Florida; Lake Jones, Judge.

Action of ejectment by the United States against Lewis G. Norton. Judgment for defendant (14 F.[2d] 184), and the United States appeals. Reversed and remanded, with direction.

E. T. Burke, Sp. Asst. Atty. Gen., Francis L. Poor, Asst. U. S. Atty., of Jacksonville, Fla., and E. O. Patterson, Solicitor for Interior Department, of Washington, D. C (B. M. Parmenter, Asst. Atty. Gen., and William M. Gober, U. S. Atty., of Tampa, Fla., on the brief), for the United States.

Charles R. Pierce, of Miami, Fla., for appellee.

Before WALKER and FOSTER, Circuit Judges.

WALKER, Circuit Judge. The United States brought an action of ejectment against Lewis G. Norton, the appellee, to recover possession of a tract of land, described as follows: "Lot seven (7), section 2, township 53 south, range 42 east, Tallahassee meridian, Florida," which contains 41.95 acres, located between the Atlantic Ocean on the east and Biscayne Bay on the west, and about 6 miles from Miami Beach and 6½ miles from Miami Beach post office. It was admitted that the legal title to the land was in the United States. By an equitable plea the appellee asserted the right to remain in possession of the land until such time as he may be allowed to perfect his title under a homestead claim, or until he can assert his equitable rights to the title after the issuance of patents to purchasers at a town-site sale hereinafter mentioned. The court's decree adjudged that the appellee was entitled to the right of possession asserted by that plea, and that the United States, the appellant here, take nothing by reason of its suit for ejectment.

The following state of facts is disclosed by the record:

For many years prior to March 11, 1921, the land sued for, together with other adjoining land, was reserved for life-saving purposes, the land so reserved being designated lot 6 of said section 2. In April, 1920, the appellee erected a dwelling on lot 6 and moved onto the land with his family, with the intention of acquiring title thereto under the homestead laws. In June, 1920, he made a formal application to enter lot 6 as his homestead. That application was rejected, because that land had been withdrawn and was not subject to homestead entry. The appellee did not question the propriety of that rejection. The President, by a proclamation dated March 11, 1921, permanently reserved for the Coast Guard the part of lot 6 between its south line and a line 500 feet directly north thereof, and running parallel with the south line of lot 6, and released from withdrawal the remainder of lot 6, the proclamation stating: "I do hereby release from withdrawal and restore to the public domain, subject to the public land laws of the United States, and to the jurisdiction of the Interior Department, the balance of land embraced within said lot 6 * * * outside of the permanent withdrawal herein created."

At that time appellee's dwelling house and outbuildings were on the part of lot 6 which was permanently withdrawn by the President's proclamation. After March 11, 1921, appellee moved his dwelling house and outbuildings to the part of lot 6 which was released from withdrawal and restored to the public domain, as above stated, and on March 14, 1921, filed a relinquishment of all claims to the south 500 feet of lot 6, and filed his homestead application for the remainder of that lot, describing such remainder by metes

and bounds. On April 1, 1921, the Commissioner of the General Land Office transmitted a copy of the President's proclamation of March 11, 1921, to the local land office at Gainesville, Fla., notified the register and receiver that steps would be taken to survey and mark upon the ground the land reserved and that restored to the public domain, and directed those officials to note the action taken upon the proper records of their office, and to allow no entries for the portion of lot 6 restored to the public domain until further advised by the office of the Commissioner of the General Land Office. The notation directed was made.

A letter of the Commissioner of the General Land Office to the Secretary of the Interior, dated May 9, 1921, transmitting appellee's homestead application, dated March 14, 1921, suggested that the lands were valuable as town lots, and mentioned an offer of $30,000 for them, which had been received. On May 23, 1921, the Secretary of the Interior rejected appellee's homestead application of March 14, 1921, for the reasons that the land had not been opened to disposal, and was not subject to settlement and entry. In March, 1921, appellee's attorney applied to the Commissioner of the General Land Office for the immediate protraction of the official plat of the line dividing that portion of lot 6 restored to the public domain from that permanently reserved, in order that appellee might make proper application for homestead entry. The Commissioner of the General Land Office replied, under date of March 23, 1921, that an order had already been made "providing for the marking upon the ground of said lot * * * needed to be reserved for life saving purposes, * * * so that a plat might be constructed showing the areas of the lot needed and not needed for life-saving purposes."

The survey referred to was made on the ground by the United States on or about May 14, 1921, and the plat thereof was approved by the Commissioner of the General Land Office, May 24, 1922, and a copy thereof transmitted to the register of the land office at Gainesville, Fla., under date of June 6, 1922. That plat shows original lot 6 as lots 7 and 8; lot seven being the portion restored to the public domain, and being the land sued for, and lot 8 being that portion reserved by proclamation of March 11, 1921, for Coast Guard purposes. The President, by executive order dated June 10, 1921, reserved for town-site purposes under section 2380, R. S. (Comp. St. § 4784), and for disposal, under section 2381, R. S. (Comp. St. § 4785), all of said lot 6 released from reservation and withdrawal and restored to the public domain, and to the jurisdiction of the Interior Department, by the proclamation of March 11, 1921. Under that executive order another survey was made, dividing that portion of lot 6 (now lot 7) upon which appellee had settled into town lots, and in February, 1924, a public sale of those town lots, after being duly advertised, was held, and the lots, or a great number of them, were sold to the highest bidder.

Appellee had posted notice of his claim and was in actual possession at the time of the sale. No patents have issued to any of the purchasers at said town-site sale, and none of them has taken any steps to obtain possession of the lots so purchased, and appellee has been, since May 14, 1921, in actual possession of lot 7, cultivating the same as far as he can without interfering with the lot stakes put down by appellant, and making that land the home of himself and his family. Appellee at all times has been qualified in every way to acquire land under the homestead laws of the United States. The land sued for is adapted to agriculture. It is not on the shore of any harbor, is not at the junction of any rivers, and is not located at any important portage. The only house within 2½ miles to the south is the house of refuge of the Coast Guard Service, and there is no house for many miles to the north. Other facts disclosed by the record are not mentioned, because they are not considered to be material.

[1] It was not contended that, while the land sued for was unsurveyed public land, as it was when appellee filed his homestead application in March, 1921, and when the above-mentioned executive order of June 10, 1921, was made, appellee was entitled to make a homestead entry thereof, or to have his application to file such entry favorably acted on. The contention in his behalf was that, under the Act of May 14, 1880 (21 Stat. 141), his settlement on the land in March, 1921, with the intention of claiming it under the homestead laws, had the effect of conferring on him an inchoate right to the land, and of enabling him to perfect his title under the homestead laws as soon as the land was surveyed. That act reads as follows:

"Any settler who has settled, or who shall hereafter settle, on any of the public lands of the United States, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall be allowed the same time to file his homestead application and perfect his original entry in the United States land office as is now allowed to settlers under the pre-emption laws to put their claims

on record, and his right shall relate back to the date of settlement, the same as if he settled under the pre-emption laws." Section 3 (Comp. St. § 4538).

The just quoted statute indicates no purpose to do more than, as to the time of filing his application and perfecting his entry, to put a settler having the intention to claim land under the homestead laws upon the same footing as that of a settler under the pre-emption laws. That statute does not purport to change or modify the already existing law as to the nature of the right acquired by settling on public land with the intention of acquiring title under the public land laws. The nature and extent of that right were well settled long prior to the enactment of that statute.

[2] The settlement does not confer on the settler any vested right to the land. It confers on him only a preference over others, in the event the land is thrown open to entry, but does not deprive the government of the right to dispose of the land otherwise than under the pre-emption or homestead laws, or to appropriate it to any public use. Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668; Yosemite Valley Case, 15 Wall. 77, 21 L. Ed. 82. "The United States make no promise to sell him the land, nor do they enter into any contract with him upon the subject. They simply say to him: If you wish to settle upon a portion of the public lands, and purchase the title, you can occupy any unsurveyed lands which are vacant and have not been reserved from sale; and, when the public surveys are made and returned, the land not having been in the meantime withdrawn from sale, you can acquire, by pursuing certain steps, the right to purchase them." Buxton v. Traver, 130 U. S. 232, 235, 9 S. Ct. 509, 510 (32 L. Ed. 920).

The decision in the case of Nelson v. Northern Pacific Railway, 188 U. S. 108, 23 S. Ct. 302, 47 L. Ed. 406, furnishes no support for the contention that a settler's occupation of public land with the intention of claiming it under the homestead laws has any effect upon the right or power of the government to dispossess the settler for the purpose of subjecting the land to an authorized use, or of disposing of it otherwise than under the homestead laws. That case involved a contest between the Northern Pacific Railway Company, claiming under a grant of lands within prescribed limits, which excepted lands within those limits which were occupied by homestead settlers when the grant was to take effect upon the definite location of the railroad, and a homestead settler who was occupying the land in question at the time of the def-

inite location of the railroad. The decision in favor of the settler was based upon the ground that by its terms the grant under which the railway company claimed did not include land which at the time of the definite location of the railroad was occupied by homestead settlers.

That decision has no bearing upon the question of the rights as against the government of one who occupied public land with the intention of claiming it under the homestead laws. His occupation of the land confers on him no right, except as against others asserting claims to the land under the public land laws, or under a grant or conveyance by the government, and his possession is in subordination to the right or power of the government, through its officials acting in pursuance of law, to make a use or disposition of the land inconsistent with the acquisition of title to it under the homestead laws. Shepley v. Cowan, 91 U. S. 330, 23 L. Ed. 424.

The language of the President's proclamation of March 11, 1921, negatives the conclusion that it was intended that the land sued for, upon its restoration to the public domain, was to be subject to be appropriated by one who occupied it with the intention of claiming it under the homestead laws. That land, upon its restoration to the public domain, was expressly made "subject to the public land laws of the United States and to the jurisdiction of the Interior Department." The public land laws, to which the land sued for, upon its restoration to the public domain, became subject, included the Joint Resolution of February 14, 1920 (41 Stat. 434 [Comp. St. § 4530a]), giving to honorably discharged soldiers, sailors, and marines a preferred right of entry, and sections 2380 and 2381 of the Revised Statutes; and the jurisdiction of the Interior Department, to which the land was subject, included the right or power of that department to supervise and control that land to the end of keeping it from being used, possessed, acquired, or disposed of otherwise than in accordance with law. United States v. Beebe, 127 U. S. 338, 8 S. Ct. 1083, 32 L. Ed. 121. The above-mentioned joint resolution reads as follows:

"Hereafter, for the period of two years following the passage of this act, on the opening of public or Indian lands to entry, or the restoration to entry of public lands theretofore withdrawn from entry, such opening or restoration shall, in the order therefor, provide for a period of not less than sixty days before the general opening of such lands to disposal in which officers, soldiers, sailors, or marines who have served in the Army or Navy

of the United States in the war with Germany and been honorably separated or discharged therefrom or placed in the regular Army or Naval Reserve shall have a preferred right of entry under the homestead or desert land laws, if qualified thereunder, except as against prior existing valid settlement rights and as against preference rights conferred by existing laws or equitable claims subject to allowance and confirmation: Provided, that the rights and benefits conferred by this Act shall not extend to any person who, having been drafted for service under the provisions of the Selective Service Act, shall have refused to render such service or to wear the uniform of such service of the United States." Comp. St. 1923 Supp. § 4530a.

The just quoted provision was amended by Joint Resolution of January 21, 1922 (42 Stat. 358 [Comp. St. § 4530a]), by changing the word "two" to "ten," and the word "sixty" to "ninety." That provision evidences the recognition by the lawmakers of the general practice of the Land Department of withholding, until after a formal opening to disposal, permission to appropriate land restored to the public domain after having been withdrawn. That provision had the effect of forbidding the restoration to homestead entry of the land sued for, otherwise than by an order containing a provision for honorably discharged soldiers, sailors, or marines having a preferred right of entry for a period of not less than 60 days before the general opening of such land to disposal. The preferred right of entry so required to be provided for was subordinated to nothing except "prior existing valid settlement rights and as against preference rights conferred by existing laws or equitable claims subject to allowance and confirmation."

When the land sued for was restored to the public domain, appellee had no right based upon a prior settlement thereon, and, so far as appears, no one then had any valid claim to that land. In the circumstances attending the restoration to the public domain of the land sued for, it could not legally, within 60 days of the date of such restoration, be open to disposal to any one who had not been a soldier, sailor, or marine who had served in the Army or Navy of the United States in the war with Germany. The provision under consideration well may be regarded as being inconsistent with the existence of a right in any one to acquire a prior claim to public land by settling on it after it was restored to the public domain and before it was opened to disposal under the homestead or desert land laws by an order containing the prescribed provision for the benefit of former soldiers, sailors, or marines.

But, even if appellee, by settling on the land sued for after it was restored to the public domain, acquired a preferred right which would be enforceable upon the land becoming subject to entry under the homestead laws, that right was not such a one as precluded an authorized use or disposition of the land by the government. Section 2380 of the Revised Statutes authorizes the President "to reserve from the public lands, whether surveyed or unsurveyed, town sites on the shores of harbors, at the junction of rivers, important portages, or any natural or prospective centers of population." Section 2381, R. S., contains provisions as to the survey and sale of lands so reserved.

[3] The executive order, reserving for townsite purposes under R. S. § 2380, the land sued for, imported a finding by the President that that land was such public land as, under R. S. § 2380, the President is authorized to reserve. It appearing that the land in question is not on the shore of any harbor, is not at the junction of any rivers, and is not located at any important portage, it is to be inferred that the President found that it was a natural or prospective center of population. There is no inconsistency between such a finding and the fact that the land in question is adapted to agriculture, as land adapted to agriculture well may be a natural or prospective center of population.

[4] Such a finding by the President is conclusive on the courts, certainly in the absence of impeachment on the ground of fraud or imposition. Cameron v. United States, 252 U. S. 450, 40 S. Ct. 410, 64 L. Ed. 659; Edenborn v. United States (C. C. A.) 5 F.(2d) 814. The record contains no evidence warranting an impeachment of that finding on any ground. The result of the town-site lot sale indicates that that finding was fully justified. The executive order under consideration was an authorized exercise of power over public land for a public purpose. The provisions contained in R. S. §§ 2380, 2381, were originally enacted by the Act of March 3, 1863 (12 Stat. 754), entitled "An act for increasing the revenue by reservation and sale of town sites on public lands." It is quite apparent that a statute providing for so changing existing methods of disposing of public land as to effect an increase of the government's revenue is one for a public purpose, and that public land reserved pursuant to such a statute is reserved for a public purpose. Possession and exclusive control by the government of the land so reserved were necessary for the due exercise of the powers and duties incident to the survey and sale of the land. The government was entitled to be

ready to deliver possession of a lot to the purchaser of it before exacting payment of the price or any part of it. As the owner of the land it was entitled to possession of it, for itself, not for those who might or might not get title to the whole or a part of the lands by complying with the terms of a sale or sales of it.

[5] An occupant of the land who had acquired no right to remain in possession of it was subject to be ejected therefrom at the suit of the government. Camfield v. United States, 167 U. S. 518, 17 S. Ct. 864, 42 L. Ed. 260; Light v. United States, 220 U. S. 523, 31 S. Ct. 485, 55 L. Ed. 570. The executive order under consideration had the effect of preventing the acquisition by appellee of title to the land sued for under the homestead laws, and of depriving him of any right to retain possession of it.

As the evidence showed that appellee had no right to remain in possession of the land sued for, and that appellant as owner was entitled to possession of it when the suit was brought, the above-mentioned ruling was erroneous.

The judgment is reversed, and the cause is remanded, with direction that a new trial be granted.

Reversed.