**James W. LEE, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 277-85L.**

United States Claims Court.

Jan. 29, 1991.

**458**

Steven P. Oliver, Anchorage, Alaska, for plaintiffs.

Gregory D. Page, Washington, D.C., for defendant.

OPINION

ANDEWELT, Judge.

This fifth amendment takings case involves lands located in Eagle River Valley outside of Anchorage, Alaska (the land). James W. Lee, Ralph A. Eklund, and Warren Carr sought to acquire title to the land from the United States based on their respective homesteading activities, which commenced in the late 1950s. In 1961, the Department of the Interior, Bureau of Land Management (BLM) rejected each of their applications for title on the ground that the land was not open for entry to homesteading. In 1979, pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1629e (1986) (ANCSA), the United States turned over title to the disputed land to two Alaska native corporations (the Native Corporations).

After the conveyance of the land to the Native Corporations, Lee, Eklund, and Cora Carr (Warren's widow), filed consolidated actions in district court against both the United States and the Native Corporations. They sought either title to the land or money damages for an unauthorized taking. The district court dismissed the

actions, *Lee v. United States*, 629 F.Supp. 721 (D.Alaska 1985), and the Court of Appeals for the Ninth Circuit affirmed, *Lee v. United States*, 809 F.2d 1406 (9th Cir.1987).

In the instant takings action, plaintiffs, Lee, Eklund, and Cora Carr, contend that as a result of their homesteading activities, they secured equitable title to the land which they could properly assert in a cause of action against any third party to whom the United States transferred the land, including the Native Corporations. They further allege that this equitable title and the resulting cause of action were subsequently taken by the United States in violation of the fifth amendment.[1]

This action is presently before the court on plaintiffs' motion for partial summary judgment and defendant's motion to dismiss the complaint on the grounds of res judicata, the running of the statute of limitations, and plaintiffs' failure to state a claim. Because defendant relied upon matters outside of the pleadings, the parties were given notice that defendant's motion to dismiss for failure to state a claim would be treated as a motion for summary judgment and plaintiffs were given an opportunity to present relevant materials. RUSCC 12(b). For the reasons set forth below, plaintiffs' motion for partial summary judgment is denied and defendant's motion to dismiss based on res judicata and the running of the statute of limitations is denied. However, defendant's motion to dismiss for failure to state a claim, treated as a summary judgment motion, is granted.

I.

The Ninth Circuit summarized the background facts in its decision as follows:

In 1950, the Federal Power Commission, acting under the Federal Power Act, set aside certain lands in the Eagle River Valley, near Anchorage, Alaska, as a possible site for future power projects. In 1952, at the request of the Bureau of Land Management, the Power Commission determined that the lands would not

1. Plaintiffs' October 10, 1990, motion to file a second amended complaint is granted. Herein, plaintiffs' cause of action is evaluated based on that complaint.

be injured for purposes of power development by location or entry on the lands under the public land laws. Following that "no injury" determination, the Secretary of Interior could have declared the lands open for homesteading and other entry, but did not.

In 1957, Lee, Eklund, and Carr located on lands in the Eagle River Valley that included some of the lands classified under the Power Act, with the expectation of taking title under the homestead laws. The Bureau of Land Management had told them that they could stake homestead claims in the Valley. The Power Commission, however, had advised them that the classified lands would be unavailable for homesteading until the Bureau of Land Management formally restored the lands to the public domain. At the time, the region had not been surveyed, and the boundaries of the classified lands were not precisely defined.

In 1959, Lee, Eklund, and Carr, sent a letter to the Secretary inquiring as to why, even though the Power Commission had determined that the classified lands could be made available to homesteaders, the Bureau of Land Management had not restored the lands to the public domain. In his letter of response, the Secretary told them that specific determinations regarding the fate of the classified lands would have to await the completion of an engineering survey, and stressed that the classified lands were not open to entry. He also said that he did not intend to revoke the powersite classification, and that, even if he did do so, selection rights to the classified lands might be given to other groups.

In 1961, the Bureau of Land Management recorded its survey of the region and issued final decisions rejecting the homestead applications of Lee, Eklund, and Carr insofar as the applications conflicted with the powersite classification. Lee, Eklund, and Carr continued to argue with the Bureau of Land Management concerning the extent of their homestead holdings until 1964, when they received patents to all of the lands that they had claimed outside of the powersite classification.

\*     \*     \*     \*     \*     \*

In 1971, Congress passed the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1629e (1982). In 1979, pursuant to the Settlement Act, the formerly classified lands were patented to two Alaska Native corporations, Eklutna, Inc. and Cook Inlet Region, Inc.

*Lee*, 809 F.2d at 1407–08 (footnote omitted).

In the district court action, plaintiffs argued, *inter alia*, that as transferees of the land from the United States, the Native Corporations held the land in constructive trust for plaintiffs. Plaintiffs based their argument upon a series of decisions in which the courts held that homesteaders who fulfill all the requirements of the homestead laws obtain equitable title to land which they later can assert against a third party to whom the United States transfers the land. *See, e.g., Johnson v. Towsley*, 80 U.S. (13 Wall) 72, 20 L.Ed. 485 (1871); *Moore v. Robbins*, 96 U.S. 530, 24 L.Ed. 848 (1878); *In re Emblen*, 161 U.S. 52, 16 S.Ct. 487, 40 L.Ed. 613 (1896); *Bockfinger v. Foster*, 190 U.S. 116 (1903); *Rector v. Gibbon*, 111 U.S. 276, 4 S.Ct. 605, 28 L.Ed. 427 (1884). As to the availability of the land for homesteading, plaintiffs argued that Section 24 of the Federal Power Act, 16 U.S.C. § 818 (1985), required the Secretary of the Interior (the Secretary) to declare the land open to homestead entry following the Federal Power Commission's 1952 "no injury" determination. Thus, plaintiffs concluded that the "no injury" determination had the effect of restoring the disputed lands to the public domain and, hence, making the land available for homesteading. In addition to seeking title, plaintiffs sought monetary compensation based on the allegation that the United States had unlawfully taken plaintiffs' land in violation of the fifth amendment.

The district court dismissed all claims against the United States and the Native Corporations for either lack of subject matter jurisdiction or failure to state a claim. *Lee*, 629 F.Supp. at 734. The court dismissed the takings claim on the ground

that the United States Claims Court has exclusive jurisdiction over takings claims in excess of $10,000. *Id.* at 733–34. On appeal, plaintiffs contested the dismissal of all claims except the takings claim.

In affirming the district court's decision, the Ninth Circuit characterized the claims against the United States as involving "either directly or indirectly, the United States' title to the disputed lands." *Lee*, 809 F.2d at 1409. The court concluded that the exclusive source of district court jurisdiction over such title claims against the United States is the Quiet Title Act (QTA), 28 U.S.C. § 2409a (1986), but that jurisdiction did not lie under the QTA for two independent reasons. First, the QTA does not permit suit when the United States has disclaimed all interest in the land as it did herein by conveying the land to the Native Corporations and, second, the 12–year statute of limitations in the QTA had expired. As to the statute of limitations, the court stated: " '[Plaintiffs] should have realized by 1961 that the United States had a conflicting claim to the portions of their homestead entries within the Power Site Classification[,] [because in] that year the [BLM] issued its survey covering the disputed lands, published notice of the survey in the Federal Register, and issued final decisions rejecting their homestead entries.' *Lee*, 629 F.Supp. at 727." *Lee*, 809 F.2d at 1410.

As to the claims against the Native Corporations, the district court and the Ninth Circuit concluded, for different reasons, that the district court lacked jurisdiction to entertain an action attempting to enforce equitable title against the Native Corporations. The district court concluded that the ANCSA preempted any such constructive trust suit against the Native Corporations. *Lee*, 629 F.Supp. at 729. The Ninth Circuit, however, did not rely upon preemption. The court acknowledged the ordinary rule that "the fact that a claimant is barred from proceeding against the United States

by the jurisdictional provisions of the [QTA] does not prevent the claimant from asserting title to disputed lands against non-federal parties." *Lee*, 809 F.2d at 1410. However, based on the particular facts involved, the Ninth Circuit concluded that the United States was an indispensable party to plaintiffs' suit against the Native Corporations and that since the district court lacked jurisdiction over an indispensable party, it was obliged to dismiss the claim. *Id.* at 1411. However, in a subsequent decision in *Donnelly v. United States*, 850 F.2d 1313 (9th Cir.1988), *cert. denied*, 488 U.S. 1046, 109 S.Ct. 878, 102 L.Ed.2d 1001 (1989), the Ninth Circuit adopted the *Lee* district court view that the ANCSA preempted any such suit against transferees of the land thereunder.

## II.

■■■ Under the doctrine of res judicata, also called claim preclusion, a final decision on the merits of a claim bars a subsequent action on the same claim, or any part thereof, including issues that were not but could have been raised as part of the claim. *Hasson v. United States*, 220 Ct.Cl. 615, 618 F.2d 121 (1979); *Container Transport Int'l, Inc. v. United States*, 199 Ct.Cl. 713, 717, 468 F.2d 926, 928 (1972).[2] Res judicata cannot apply here because the instant claim was not and could not have been considered by the Ninth Circuit when it dismissed the claims against the United States.

■■■ As noted above, the Ninth Circuit concluded that the statute of limitations had run on any suit against the United States to acquire title because the QTA is the exclusive statutory basis for a suit against the United States to quiet title and plaintiffs had been aware since 1961 that the government had a conflicting claim to the disputed land. But in the instant action, plaintiffs do not seek title to the land

---

**2.** A decision that the statute of limitations has run is considered a final decision capable of res judicata effect only when the statute operates as a limitation on the right involved so that the running of the time period destroys the cause of action. A holding that the statute of limitations

has run cannot be given res judicata effect where the statute affects only the remedy. 1B J. Moore, J. Lucas, T. Currier, *Moore's Federal Practice*, ¶ .409[6] at 334 (2d ed. 1988) (hereinafter *Moore's Federal Practice* ).

and do not dispute that the statute of limitations has run on a quiet title action against the United States. Instead, plaintiffs base their claim on the precedent described above, in which persons who fulfill all requirements under the homestead laws are permitted to assert "equitable title" against persons to whom the United States subsequently transferred the land. Plaintiffs allege, in effect, that even if they could not sue the United States directly to quiet title, plaintiffs maintained equitable title to the land which they could assert against any third party transferee. The essence of plaintiffs' instant takings claim, therefore, is that through acts that occurred long after 1961, specifically the passage of the ANCSA in 1971, the conveyance of the land to the Native Corporations in 1979, and the Ninth Circuit's 1987 decision, the United States eliminated the cause of action plaintiffs otherwise would have had against the Native Corporations when the United States conveyed the land. Plaintiffs allege, in effect, that the elimination of their right to assert equitable title in a cause of action against the Native Corporations constitutes a taking of plaintiffs' property in violation of the fifth amendment.

The instant claim, therefore, is different than the claim the Ninth Circuit evaluated and found barred by the statute of limitations. Plaintiffs do not seek title to the land but rather seek compensation under the fifth amendment. Plaintiffs had sought to present a takings claim in the district court, but the court correctly concluded that only the Claims Court possesses jurisdiction to hear such a claim. Hence, when the Ninth Circuit concluded that the statute of limitations had commenced to run in 1961 on the action then before it, the court did not and could not address the merits of plaintiffs' takings

claim. Res judicata therefore does not apply.[3]

### III.

Plaintiffs' takings claim is governed by the statute of limitations in 28 U.S.C. § 2501, which requires plaintiffs to file suit "within six years after [a] claim first accrues." "A claim first accrues when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Ass'n of Philippines, Inc. v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358 (1967), *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). Plaintiffs filed their takings claim herein on May 13, 1985.

Defendant contends that the statute of limitations on the instant action commenced to run in 1961, as it did for the claims against the United States in the district court action. Clearly, the statute of limitations would bar any takings claim against the United States based on its refusal to turn over title of the disputed land to plaintiffs' in 1961, or its subsequent maintenance of control over the land up through the conveyance to the Native Corporations. As the district court noted, "[plaintiffs] should have realized by 1961 that the United States had a conflicting claim to the portions of their homestead entries within the Power Site Classification." *Lee*, 629 F.Supp. at 727.

But, as summarized above, the instant takings claim, as defined in the complaint, is not based on defendant's refusal to turn over title in 1961 or its subsequent maintenance of control over the land. Rather, plaintiffs contend that even though defendant refused to grant them title in 1961, plaintiffs retained equitable title to the land which they could assert to secure title from a third party to whom the United

---

3. The "modern trend" is to apply res judicata to all causes of action that flow out of the same transaction. *See Moore's Federal Practice*, ¶ .410[1] at 359. But res judicata would not apply here even if this court concluded that the two cases involved the same transaction and, hence, the same claim. The district court dismissed plaintiffs' takings claim because the

Claims Court has exclusive jurisdiction over takings claims in excess of $10,000. When, as a result of such a jurisdictional limitation, a plaintiff is barred from presenting one of its theories for recovery on a claim, res judicata does not preclude a subsequent suit based on that excluded theory in a court of competent jurisdiction. *See Id.* at 351 n. 10.

States transferred the land. Thus, the "property" plaintiffs allege was taken in violation of the fifth amendment was their equitable title and their cause of action that they otherwise would have possessed against the Native Corporations as transferees of the land.

In appropriate circumstances, a cause of action can constitute "property" protectable under the fifth amendment. *Langenegger v. United States*, 756 F.2d 1565, 1573 (Fed.Cir.1985), *cert. denied*, 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985). *See also Pritchard v. Norton*, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104 (1882); *Sperry Corp. v. United States*, 853 F.2d 904 (Fed. Cir.1988). Assuming, for purposes of evaluating the statute of limitations defense here, that the purported cause of action against the Native Corporations did exist and that the cause of action constituted "property" protectable under the fifth amendment (*i.e.*, assuming the complaint states a claim), that cause of action clearly was not "taken" in 1961. Indeed, the essence of the case law that defines equitable title and the resulting cause of action available against third party transferees is that such title and cause of action survive an erroneous decision by the United States not to turn over title to a homesteader. *See, e.g., Johnson v. Towsley*, 80 U.S. (13 Wall) at 84.

Defendant presents the alternative argument that, in any event, the statute of limitations on plaintiffs' purported takings claim would have commenced to run upon the adoption of the ANCSA in 1971, which is also outside the statute of limitations. Indeed, the district court in *Lee* and the Ninth Circuit in *Donnelly* concluded, in effect, that upon its enactment, the ANCSA preempted any equitable title claims that otherwise existed against the Native Corporations for land transferred to them pursuant to the ANCSA. But assuming this conclusion in *Donnelly* is correct, the date the ANCSA was enacted still should not be viewed as the date on which the statute of limitations commenced to run on a possible takings claim. Plaintiffs could not have brought suit on their equitable title until the land was actually transfer-

red. Moreover, when the ANCSA was enacted, plaintiffs apparently had no reason to know their land would be transferred to the Native Corporations and, hence, the extent, if any, the ANCSA would affect them. In this context, "all the events which fix ... the alleged liability of the United States" for an alleged taking did not occur at least until the land was transferred to the Native Corporations on May 24 and September 19, 1979. To conclude otherwise would interpret 28 U.S.C. § 2501 to have required each and every homesteader with equitable title to land to have brought a takings action upon enactment of the ANCSA on the chance that the government may later assign land in which they have an interest to a Native Corporation pursuant to the ANCSA. Accordingly, plaintiffs' takings claim is not barred by the statute of limitations.

### IV.

A necessary prerequisite to any fifth amendment takings claim is that the plaintiff own or have title to the property in issue. *United States v. Dow*, 357 U.S. 17, 20, 78 S.Ct. 1039, 1043, 2 L.Ed.2d 1109 (1958); *Georgia–Pacific Corp. v. United States*, 215 Ct.Cl. 354, 359, 568 F.2d 1316, 1319 (1978), *cert. denied*, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978). Herein, there is no dispute that the United States originally owned the land in issue and that plaintiffs never received legal title to that land. Plaintiffs' suit, therefore, is predicated on plaintiffs being able to establish ownership of the land in the course of this takings action. But plaintiffs cannot establish such ownership herein for two independent reasons. First, for the reasons articulated by the Court of Claims in a series of related cases culminating in *Freese v. United States*, 221 Ct.Cl. 963 (1979), this court lacks authority to resolve the issue of ownership of the land in the context of plaintiffs' takings action. *See also Aulston v. United States*, 823 F.2d 510 (Fed.Cir.1987); *Patterson v. United States*, 115 Ct.Cl. 348 (1950); *Dawson v. United States*, 113 Ct.Cl. 82, 81 F.Supp. 1021 (1949). Second, under the statutory scheme here involved,

purported homesteaders cannot secure ownership rights to land, equitable or otherwise, unless the land is opened to homestead entry. The land in issue here was not open to entry.

### A.

■ Under the *Freese* line of decisions, the Claims Court does not have the authority to overturn the BLM's decision that plaintiffs' homesteading activities were not sufficient to give them ownership rights to the land. As in the instant action, *Freese* involved a Department of the Interior (DOI) refusal to grant patents to land. The plaintiff therein had sought to secure patents based on his previous mining efforts on certain land, but the DOI rejected the mining claims as null and void. Thereafter, the plaintiff brought a fifth amendment takings action in the Court of Claims. The court rejected the contention that it could review the correctness of the DOI's decision collaterally in the context of a fifth amendment takings action. The court stated:

> Plaintiff had the opportunity to participate in a hearing before the agency and to appeal the adverse decisions of the administrative law judge to the Interior Board of Land Appeals. We do not have the jurisdiction to review these administrative determinations. *Patterson v. United States*, 115 Ct.Cl. 348 (1950); *Dawson v. United States*, 113 Ct.Cl. 82, 81 F.Supp. 1021 (1949). Accordingly, plaintiff must be considered by us as having no property interest in these ... claims.
>
> Plaintiff's argument that we should exercise some type of ancillary jurisdiction to review the [DOI] determinations reveals a misapprehension about the basis of the Government's motion. This court does not lack general jurisdiction to determine whether a mining claim was taken by the Government without the pay-

ment of just compensation. Thus, we have general jurisdiction over all the essential elements of plaintiff's claim. We do not, however, have the particular power to overturn the [DOI's] conclusion that 26 of the mining lode claims allegedly owned by plaintiff and all of the millsite claims do not qualify as "claims" under 30 U.S.C. § 22 *et seq.* (1976), nor can we ignore such an administrative conclusion. Congress has chosen to place authority to review these decisions of the Secretary of the Interior in the United States District Courts. *See* Administrative Procedure Act, 5 U.S.C. §§ 701–06 (1976); *Patterson, supra,* at 354. For this court to undertake a review of the validity of the claims declared void by the [DOI] would be to assume a function lodged elsewhere by Congress and never contemplated for this court. We decline to adopt that position. *See Dawson, supra,* at 84, 81 F.Supp. at 1022.

221 Ct.Cl. at 964–65.

Herein, plaintiffs' takings claim suffers from the same essential deficiency as the claim in *Freese.* Plaintiffs could possess "equitable title" to the land only if, in fact, they were entitled to receive actual title from the United States in 1961. Therefore, plaintiffs' allegation that they had a protectable property interest in the land is necessarily predicated on plaintiffs establishing that the BLM erred in its original decision not to grant title to plaintiffs. But, as explained in *Freese,* Congress placed responsibility for consideration of land claims initially with the DOI. Here, as in *Freese,* "[the Claims Court does] not have the jurisdiction to review [DOI's] administrative determinations.... Accordingly, plaintiff[s] must be considered ... as having no property interest...." [4]

Plaintiffs seek to distinguish the *Freese* line of cases on the ground that in those cases, the DOI performed an adjudicatory

---

4. Plaintiffs rely on *Bourgeois v. United States,* 212 Ct.Cl. 32, 545 F.2d 727 (1976), in which the court resolved a dispute as to the ownership of land as a part of its consideration of a takings claim. But in *Bourgeois,* the government had granted a patent on land and the dispute in-

volved whether the land in issue was encompassed within that patent. Thus, unlike *Freese* and the case at bar, the plaintiff in *Bourgeois* was not seeking, in effect, to overturn a prior administrative decision.

function when it reviewed the land claim, but here, the BLM's actions were instead "ordinary executive actions." But, the procedures that were available to plaintiffs in this action are analogous, in pertinent part, to those available to the purported property holder in *Freese.*

Plaintiffs' applications for title initially were evaluated by a BLM official who determined that the proofs presented did not support the grant of title. While plaintiffs did not so choose, they could have appealed that determination within the DOI. An appeal to the Director of the BLM was initially available. Pursuant to the then-applicable regulations, plaintiffs could have requested a hearing to present evidence on issues of fact (43 C.F.R. § 221.6 (Supp. 1962)) or an opportunity to present an oral argument (43 C.F.R. § 221.8). If plaintiffs' initial appeal to the Director of the BLM was not successful, plaintiffs could have appealed the decision to the Secretary of the Interior. 43 C.F.R. §§ 221.31 *et seq.*[5] Thus, the regulations provided an internal appeals process by which plaintiffs could have challenged the BLM's decision not to grant them title. Plaintiffs chose not to pursue that process or to institute district court action.[6] In this context, the rationale of *Freese* applies and this court lacks authority to consider the correctness of the BLM's 1961 decision.[7]

Next, plaintiffs argue that even if *Freese* applies, this court should retain jurisdiction to refer the case to district court for a decision on the ownership issue. But this would be futile because the Ninth Circuit in *Lee* already has held that the statute of limitations has run on any district court suit seeking to reverse the BLM's 1961 decision.[8]

### B.

█ Finally, plaintiffs fail to state a claim for the distinct reason that purported homesteaders cannot secure any ownership right to land under the homestead laws, equitable or otherwise, when the land is not open to homestead settlement. *E.g., Wood v. Beach,* 156 U.S. 548, 551, 15 S.Ct. 410, 411, 39 L.Ed. 528 (1895) ("[I]t is clear that [the homesteader] acquired no equitable rights by his occupation and settlement. He went upon lands which were not open to homestead or preemption entry, and cannot make his unauthorized occupation the foundation of an equitable title."); *Westling v. United States,* 60 F.2d 398, 405 (8th Cir.1932) ("All he acquired in settling upon the land was a right of priority over other homesteaders 'in case the land should at some future time be opened for entry.'

---

**5.** Plaintiffs argue that they "appealed their case all the way to the Secretary of the Interior and that any deviation from 'formal' procedures was a consequence of defendant's misconduct." As evidence of their appeal, plaintiffs cite a letter to the Secretary dated February 8, 1959. But this letter was delivered to the Secretary long before plaintiffs' homestead applications were denied in 1961. The 1959 letter could not constitute an appeal, formal or informal, of the 1961 decision. Furthermore, in the 1961 decision denying plaintiffs' homestead applications, the manager of the land office specifically informed plaintiffs that they had 30 days in which to appeal the decision under the procedures set out in 43 C.F.R. § 221.

**6.** In *Patterson v. United States,* 115 Ct.Cl. 348, 354 (1950), decided over ten years before plaintiffs' claim was denied in 1961, the court indicated that the Administrative Procedures Act seemingly gave jurisdiction to the district court to review DOI decisions not to grant patents on land. In addition, the DOI internal regulations applicable in 1961, in effect, anticipated district

court review under certain circumstances. 43 C.F.R. § 221.10 provided: *"Effect of failure to appeal.* When any party fails to appeal to the Secretary from an adverse decision of the Director, that decision shall as to such party be final and will not be disturbed except for fraud or for gross irregularity." Moreover, plaintiffs do not contend that their respective parcels of land in issue had a value less than the amount then required under 28 U.S.C. § 1331 for general district court jurisdiction over federal questions.

**7.** Plaintiffs allege "misrepresentations" by the United States, but the only acts plaintiffs point to are instances where the United States expressed the legal conclusion that the land was not open to entry. Indeed, rather than impeding plaintiffs from taking an appeal within the BLM, the United States notified plaintiffs as to their right to appeal. *See supra* note 5.

**8.** The Ninth Circuit noted that the time to seek review under the Administrative Procedures Act had expired. *Lee,* 809 F.2d at 1409 n. 2.

That is as far as the cases go, and that is as far as his rights go. He acquired no equitable title as against the government."); *United States v. Norton,* 19 F.2d 836, 839 (5th Cir.1927), *cert. denied,* 275 U.S. 558, 48 S.Ct. 118, 72 L.Ed. 425 (1927) ("[S]ettlement does not confer on the settler any vested right to the land. It confers on him only a preference over others, in the event the land is thrown open to entry, but does not deprive the government of the right to dispose of the land otherwise than under the pre-emption or homestead laws, or to appropriate it to any public use. *Frisbie v. Whitney,* [76 U.S. (9 Wall) 187, 19 L.Ed. 668 (1870)]; *Yosemite Valley Case,* [82 U.S. (15 Wall) 77, 21 L.Ed. 82 (1873)]").

Plaintiffs claim homesteading rights under 43 U.S.C. § 161, which provides, in pertinent part:

Every person who is the head of a family, or who has arrived at the age of twenty-one years, and is a citizen of the United States, ... shall be entitled to enter one quarter-section or a less quantity of *unappropriated* public lands, to be located in a body in conformity to the legal subdivisions of the public lands.

43 U.S.C. § 161 (1952) (emphasis added). But here, the land was not "unappropriated." In 1950, prior to plaintiffs' entry upon the lands, the Secretary of the Interior provided notice that the land had been classified as power sites. The notice of classification specifically stated that title to the covered lands "remains in the United States" and that "this classification shall have full force and effect under the provisions of section 24 of the [Federal Power Act]." 15 Fed.Reg. 1900 (1950). Section 24, in turn, contemplates that lands classified as power sites can potentially become open to entry but only upon certain prerequisites, including (1) the Federal Power Commission makes a "no injury" determination, and (2) the Secretary of the Interior thereafter declares such lands open to homestead entry. Before the Secretary declares a power site open to entry, Section 24 obliges the Secretary to notify the governor of the state involved so as to permit the state to exercise its preference right to the land. Section 24 provides, in pertinent part:

Whenever the Commission shall determine that the value of any lands of the United States so applied for, or heretofore or hereafter reserved or classified as power sites, will not be injured or destroyed for the purposes of power development by location, entry, or selection under the public-land laws, the Secretary of the Interior, upon notice of such determination, shall declare such lands open to location, entry, or selection.... *Provided further,* That before any lands ... classified as power sites, are declared open to location, entry, or selection by the Secretary of the Interior, notice of intention to make such declaration shall be given to the Governor of the State within which such lands are located, and such State shall have ninety days from the date of such notice within which to file, under any statute or regulation applicable thereto, an application for the reservation to the State, or any political subdivision thereof, of any lands required as a right-of-way for a public highway or as a source of materials for the construction and maintenance of such highways, and a copy of such application shall be filed with the Federal Power Commission; and any location, entry, or selection of such lands, or subsequent patent thereof, shall be subject to any rights granted the State pursuant to such application.

43 U.S.C. § 818.

■ Plaintiffs do not dispute that the lands were classified as power sites. Rather, plaintiffs argue that Section 24 did not give the Secretary any discretion and that once the Federal Power Commission made a "no injury" determination, the Secretary was obliged to declare the lands open to entry ("the Secretary ... shall declare ..."). Since the Secretary was without discretion, plaintiffs argue in effect that the lands automatically became open to entry upon notice of the "no injury" determination. But Section 24 does not state that the "no injury" determination results in the automatic opening of the land. Rather, in

apparent recognition that the DOI, and not the Federal Power Commission, has authority to administer public lands,[9] Section 24 specifically requires a declaration by the Secretary that the land is open. If the "no injury" determination automatically opened the lands to entry, the Secretary would not need to make such a declaration. Similarly, if the declaration by the Secretary was not required to open the land to entry, no significant benefit would result from the requirement that the governor be notified before the Secretary declares such lands to be open.

Indeed, Section 24's requirement that the preference right holders receive notice *before* land is opened to homesteading is consistent with the procedures generally employed in other preference rights statutes. For example, 43 U.S.C. § 282 provides a preference right for World War II and Korean War veterans, which applies when previously withdrawn land is open to entry. It provides that a notice or an order revoking an order of withdrawal "shall provide for a period of not less than ninety days before the date on which [the notice or order] otherwise becomes effective." During that 90–day period, qualifying veterans "shall have a preferred right of application." *See also* Alaska Mental Health Enabling Act, Ch. 772, § 202(b), Pub.L. No. 830, 70 Stat 709, 711 (1956); Alaska Statehood Act, § 6(g), Pub.L. No. 85–508, 72 Stat. 339, 341 (1958). This common requirement that notice be given before land is actually opened has the beneficial effect of permitting holders of preference rights to indicate their intention to exercise those preference rights before homesteaders invest time and money homesteading the land.

By interpreting Section 24 to require a declaration by the Secretary prior to the opening of the land, this court takes the same approach as the Court of Appeals for the Ninth Circuit in *Buch v. Morton*, 449 F.2d 600 (9th Cir.1971). *Buch* involved a challenge to a decision by the Secretary of the Interior which declared certain mining claims invalid on the ground that the land in issue was classified for disposition under the Recreation and Public Purposes Act of 1954 and therefore was not open to location for mining. On appeal, the plaintiff argued that rather than being classified for disposition, the land had been open to location at the time plaintiff filed its amended notices of location. The plaintiff relied, in pertinent part, on the following statutory language in Section 869 of the 1954 Act: "If, within, eighteen months following such classification, no application has been filed for the purpose for which the lands have been so classified, then the Secretary shall restore such lands to appropriation under the applicable public land laws." 43 U.S.C. § 869 (1986). The plaintiff therein argued that Section 869 was self executing, that the Secretary had no discretion thereunder, and therefore the classification automatically terminated after eighteen months. The Ninth Circuit disagreed. The court concluded that rather than Section 869 being self executing, "[t]he statutory language contemplates action by the Secretary to terminate the classification." *Buch*, 449 F.2d at 607. Because the Secretary did not take the step of restoring the land to appropriation, the lands were not open to location and the plaintiff's amended notices of location were void. *Id.*[10] The

---

**9.** 43 U.S.C. § 2 (1986) provides:

> The Secretary of the Interior or such officer as he may designate shall perform all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and, also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government.

**10.** In plaintiffs' litigation in the district court and in written response to defendant's motion to dismiss herein, plaintiffs did not dispute that

the lands in issue had been reserved from entry by virtue of being classified as power sites. Rather, plaintiffs based their contention that the lands were open to entry in 1957 on their argument that pursuant to Section 24, the "no injury" determination automatically restored previously reserved lands to entry. Belatedly, during a supplemental oral argument, plaintiffs contended for the first time, in effect, that they were not relying exclusively on the "no injury" determination to support their claim to equitable title, but were contending in the alternative that the classification of the lands as power sites in 1950 was not sufficient to reserve the

same general conclusion is warranted here. As Section 869 contemplates action by the Secretary before land is opened ("the Secretary shall restore"), so too does Section 24 ("the Secretary ... shall declare such lands open"). Because the Secretary never issued that declaration, the land was never opened and plaintiffs could not have secured any equitable rights to that land.

### Conclusion

For the reasons set forth above, defendant's motion to dismiss for failure to state a claim, treated as a motion for summary judgment, is granted and the Clerk of the Court shall dismiss the complaint. No costs.

IT IS SO ORDERED.

lands from entry. Thus, plaintiffs argue, in effect, that the land was unappropriated in 1957 and subject to homesteading under 43 U.S.C. § 161. But this reading is contrary to the terms of the notice of classification and to Section 24 of the Federal Power Act, which, as summarized above, provides that lands classified as power sites are open for entry only if so declared by the Secretary of the Interior.