**SELDOVIA NATIVE ASSOCIATION, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–130L.

United States Court of Federal Claims.

May 30, 1996.

R. Collin Middleton, Anchorage, AK, for plaintiff.

Bruce M. Landon, Anchorage, AK, and James M. Upton, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant.

## OPINION

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. The first question presented is whether plaintiff's cause of action accrued, for purposes of the statute of limitations, before February 24, 1986 (six years prior to filing its claims). 28 U.S.C. § 2501 (1994). Subsumed within this issue is when and whether Pub.L. No. 94–204, 89 Stat. 1145 (1976), and Pub.L. No. 94–456, 90 Stat. 1934 (1976), can constitute a taking of plaintiff's vested property rights. These laws modified the Alaska Native Claims Settlement Act as to the pool of lands available from which the Native corporations could select their entitlement. The third question is whether the Court of Federal Claims has jurisdiction to hear breach of fiduciary duty claims and, if so, whether the enactment of Public Law Nos. 94–204 and 94–456 constituted breaches of the Government's fiduciary duty to plaintiff.

## FACTS

The following facts are undisputed, unless otherwise noted. Seldovia Native Association, Inc.'s ("plaintiff's"), claims arise out of a series of complicated actions in the mid–1970s aimed at clarifying and resolving ab-

original land claims in Alaska. In 1971 Congress enacted the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1629e (1994) (the "ANCSA"). Unresolved native claims had clouded Alaska's authority to lease lands and transfer rights regarding petroleum resources and had hindered development of the Alaskan Pipeline. Congress intended the ANCSA to provide a "fair and just settlement of all claims ... rapidly, with certainty, [and] in conformity with the real economic and social needs of Natives." 43 U.S.C. § 1601(a), (b). While the ANCSA did not explicitly acknowledge the existence of prior aboriginal rights, it did expressly extinguish "[a]ll aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy." 43 U.S.C. § 1603(b). Furthermore, because "[a]ll prior conveyances of public land ... pursuant to Federal law, and all tentative approvals pursuant to section 6(g) of the Alaska Statehood Act," 72 Stat. 339 (1958), were to extinguish all claims of aboriginal title, the ANCSA envisioned that land owners or users, as well as potential developers, would be free to build property without the uncertainty that potential aboriginal claims created. 43 U.S.C. § 1603(a).

Under the ANCSA land was to be set aside for Native peoples through a complex process. The Native residents of each Native village entitled to receive lands were required to organize as business corporations known as "Village Corporations." 43 U.S.C. § 1607(a). These villages were grouped into twelve regions "based upon common heritage and ... common interests." 43 U.S.C. § 1606(a). Each of the twelve regions formed a "Regional Corporation." 43 U.S.C. § 1606(d). Eligible Natives received corporate stock in both the Village Corporation, 43 U.S.C. § 1607(c), and the Regional Corporation, 43 U.S.C. § 1606(g), to which they belonged.

Federal public land immediately was set aside for selection by Native peoples in a process known as "withdrawal." Under withdrawal, federal public lands were recalled from all forms of appropriation under the public land laws, so that Native peoples could select lands of their choosing based upon their statutory entitlement under the

ANCSA. These withdrawn public lands fell into three categories. First were townships[1] that enclosed, partially enclosed, were contiguous to, or cornered an existing Native village ("first ring townships"). 43 U.S.C. § 1610(a)(1)(A), (B). Next were federal public lands that were contiguous to, bordered, or cornered the first ring townships ("second ring townships"). 43 U.S.C. § 1610(a)(1)(C). Finally, if the Secretary of the Interior (the "Secretary") determined that the first and second ring townships were insufficient to permit a Village or Regional Corporation to select the acreage to which it was entitled under the ANCSA,[2] the Secretary was to withdraw three times the deficiency of selected lands (a "deficiency withdrawal") from the nearest available federal public lands ("deficiency withdrawal lands"). 43 U.S.C. § 1610(a)(3)(A).

Under the ANCSA land was to be distributed to the Village Corporations in the following manner: First, the Village Corporation was to select withdrawn federal public lands from "all of the township or townships in which any part of the village is located, plus an area that will make the total selection equal to the acreage to which the village [was] entitled." 43 U.S.C. § 1611(a). These lands are known as "12(a)" lands.[3] In the event that the Village Corporation was not able to select enough acreage in the first or second ring townships to meet its 12(a) entitlement, the Secretary was to make a deficiency withdrawal, pursuant to 43 U.S.C. § 1610(a)(3)(A), to garner additional lands from which the Village Corporation might make a selection.

Subsequently, after the Village Corporations made these 12(a) selections, "[t]he difference between the [22] million acres and the total acreage selected by Village Corporations" was to be allocated by the Secretary among the Regional Corporations based upon the population enrolled in each Regional Corporation.[4] 43 U.S.C. § 1611(b). "Each Regional Corporation [was to] reallocate such acreage among the Native villages within the region on an equitable basis after considering historic use, subsistence needs, and population." 43 U.S.C. § 1611(b). These allocations to Regional Corporations are known as "12(b)" lands. Thus, the Village Corporations would receive lands by both direct selection—12(a) lands—and by grants from Regional Corporations—12(b) lands.

In addition to the lands allocated to the Village Corporations, the ANCSA contained provisions allowing Regional Corporations also to receive land. These are known as "12(c) lands." As mandated by 43 U.S.C. § 1611(c), 16 million additional acres of land, apart from the 22 million acres of 12(a) and 12(b) lands withdrawn for Village Corporations, were to be allocated to the Regional Corporations.

Plaintiff is among the 200 villages listed in the ANCSA as eligible to select land. 43 U.S.C. § 1610(b)(1). Plaintiff was assigned to the Cook Inlet Region, of which Cook Inlet Region, Inc. ("CIRI"), is the Regional Corporation. *Id.* Plaintiff's village is located on the eastern shore of Cook Inlet, and, as such, much of its first and second rings of townships are located under water. Combined with the proximity of other Native villages, this factor made the original land withdrawn by the Secretary for plaintiff's 12(a) selections insufficient.[5] Consequently, the Secretary withdrew additional "deficiency

---

1. A township is a public land surveying unit of 36 square miles (23,040 acres). *See Papasan v. Allain,* 478 U.S. 265, 268, 106 S.Ct. 2932, 2935, 92 L.Ed.2d 209 (1986) (tracing history of federal land surveying practice from Land Ordinance of 1785).

2. The amount of acreage to which a village was entitled depended upon the village's population. 43 U.S.C. § 1613(a). Plaintiff was entitled to 115,200 acres because the village of Seldovia's population was between 200 and 399 people.

3. It is common to use the citations from the ANCSA itself and not the U.S.Code when discussing the selection process (thus, the referral to "section 12(a)"). Note that because the U.S.Code citations fall one number behind the section numbers of the ANCSA, section 12(a) is codified as 43 U.S.C. § 1611(a).

4. The Regional Corporation for Southeastern Alaska was excluded for reasons unimportant to this case. 43 U.S.C. § 1611(b).

5. In addition, defendant contends that much of the land within the Cook Inlet Region had been patented to the State or private parties.

lands" in 1974 pursuant to 43 U.S.C. § 1610(a)(3)(A). These lands were to be as proximate to plaintiff's village as possible, and of the same character as the lands in which plaintiff's village was located. *Id.*

Deficiency withdrawals were available jointly for plaintiff and the villages of Ninilchik, Salamatoff, Knik, Tyonek, Chickaloon, and Alexander Creek. Plaintiff contends that this joint withdrawal was contrary to the intent of the ANCSA and that the Secretary should have made individualized deficiency withdrawals for each Village Corporation in the region. Multiple village withdrawals occurred in most ANCSA regions, according to defendant. As a result of the joint withdrawals, conflicts developed among Village Corporations that sought to select the same lands from the deficiency withdrawal. CIRI filed suit against the Department of Interior ("Interior") in the District Court for the District of Alaska alleging that the deficiency withdrawals were insufficient; plaintiff and other Village Corporations intervened. *Cook Inlet Region, Inc. v. Morton,* No. A40–73 CV (D.Alaska 1973), *appeal dismissed sub nom. Cook Inlet Region, Inc. v. Kleppe,* No. 75–2232 (9th Cir. Mar. 20, 1978).

While the suit was pending in Alaska District Court, CIRI met with the Village Corporations in 1974 to resolve the conflicts. It was decided in a "Village 12(a) Prioritization Agreement" that the Village Corporations would select their 12(a) lands in a series of rounds. In this manner the selections of lands most prized by one village would subordinate lower priority selections of the same land by other villages. The affected villages filed their 12(a) selections in accordance with this agreement. Plaintiff's selections were filed timely on December 18, 1974, and included first ring townships, second ring townships, and deficiency withdrawals. Plaintiff maintains that its timely filing of 12(a) selections created equitable and vested property rights protected by the Takings Clause of the Fifth Amendment. *See* U.S. Const. Amend. V.

The Village Corporations and CIRI then began the process of selecting the 12(b) lands, which, under the ANCSA, had to be selected by December 18, 1975. 43 U.S.C. § 1611(c)(3). This selection process was hindered by the fact that Interior now wanted to turn a large portion of the land in CIRI's region into a national park. This land— around Lake Clark—was desired by several Village Corporations (including plaintiff) for their 12(b) selections. CIRI began discussing a possible land swap with the state and Interior to exchange land around Lake Clark for other lands. CIRI also approached plaintiff and other Village Corporations about relinquishing their selections in the Lake Clark area in exchange for other selections. Plaintiff did not express an interest at that time in relinquishing its intended 12(b) selections in the Lake Clark area. Nonetheless, CIRI, Alaska, and Interior finalized an unexecuted land exchange agreement entitled "Terms and Conditions for Land Consolidation and Management in the Cook Inlet Area" (the "T & C") on December 10, 1975, shortly before the 12(b) selections had to be made, which was adopted by Congress. Under the T & C Alaska would receive from Interior two and one-half times as much land as it was relinquishing, some of which was subject only to valid village 12(a) selections, and some of which was available for 12(b) selections.[6] *See* Pub.L. No. 94–204 § 12(b), 89 Stat. 1145, 1151 (1976).

On December 15, 1975, plaintiff filed its 12(b) selections, both individually and in "blanket" form with other Village Corporations in the region. However, these selections did not follow the new T & C guidelines and included lands in the Lake Clark area and other lands specifically listed in the T & C as only available for 12(a) selections. In early January 1976, Congress incorporated the requirements and conditions set forth in the T & C and ratified them as Pub.L. No. 94–204, 89 Stat. 1145 (1976), 43 U.S.C. § 1611 note (1994).[7] However, for the Public Law to

---

**6.** The lands given to Alaska subject only to 12(a) selections were listed in Appendix E of the T & C, and the lands available for 12(b) selections were listed in ¶ VII(A) of the T & C.

**7.** Pub.L. No. 94–204, § 12(b), 89 Stat. 1145, 1151 (1976), states:

The Secretary shall make the following conveyances to the Region, in accordance with the specific terms, conditions, procedures, cove-

take effect, two conditions were mandated. First, the Village Corporations (including plaintiff) were required to withdraw any 12(b) selections in the Lake Clark area; second, CIRI and the intervenor Village Corporations (including plaintiff) were required to withdraw with prejudice their appeal, *Cook Inlet Region,* No. 75–2232; *see* Pub.L. No. 94–204, § 12(a)(2), (3), 89 Stat. 1145, 1151 (1976), 43 U.S.C. § 1611 note (1994).[8]

On May 18, 1976—almost two years after the deadline had passed for filing 12(a) selections[9]—Interior's Bureau of Land Management (the "BLM")[10] rejected a number of plaintiff's timely-filed 12(a) selections. This rejection was problematic because the ANCSA does not provide a method to reselect 12(a) lands if the original selection is invalidated after the deadline for filing has passed (as happened here).[11] The rejected selections were those made from the deficiency withdrawal and were rejected on the grounds that some were not available for 12(a) selection and they were not compact and contiguous. Under the ANCSA land selections "wherever feasible" must be in units of not less than 1,280 acres and "shall be contiguous and in reasonably compact tracts." 43 U.S.C. § 1611(a)(2). Discretion was conferred on the Secretary to find exceptions to these requirements provided certain conditions were met.[12] 43 U.S.C. § 1611(a)(2).

Plaintiff maintains that the BLM specifically had approved the selection method used to resolve the various Village Corporations'

conflicting 12(a) land claims, knowing that the method would result in tracts of less than 1,280 acres in size. Plaintiff states that it relied on the BLM's approval of this method when it participated in the priority selection process and subsequently filed its 12(a) selections. However, defendant denies that the BLM approved any selection method knowing that it would result in the selection of parcels smaller than 1,280 acres. Furthermore, defendant asserts that "no official at the Department of the Interior had authority to approve selections not in accord with the ... [ANCSA] and no BLM employee had authority to speak for the Secretary of the Interior in approving any method of selection in advance." Ans. filed Dec. 30, 1994, ¶ 16.

Plaintiff appealed the BLM's 1976 12(a) decision to Interior's Board of Land Appeals (the "IBLA"). However, before the IBLA had a chance to consider the appeal, plaintiff contends that the BLM requested (with plaintiff's consent) that the matter be remanded for reconsideration. Defendant contends that CIRI and the Village Corporations requested the dismissal so that a legislative solution could be reached.

CIRI did attempt to resolve the 12(a) problems legislatively by working out two agreements in August 1976 that were then adopted and ratified on October 4, 1976. Pub.L. No. 94–456, 90 Stat. 1934 (1976), 43 U.S.C. § 1611 note (1994). The first agreement, entered into on August 28, 1976, involved the Village Corporations (including

nants, reservations, and other restrictions set forth in the document entitled "Terms and Conditions for Land Consolidation and Management in Cook Inlet Area", ... the terms of which are hereby ratified as to the duties and obligations of the United States and the Region, as a matter of Federal law....

**8.** A third condition—that the state of Alaska had to relinquish land to the federal government—is not relevant to this litigation. Pub.L. No. 94–204, § 12(a)(1), 89 Stat. 1145, 1151 (1976), 43 U.S.C. § 1611 note (1994).

**9.** Pursuant to § 1611(a)(1), the selections were to be made during a three-year period commencing on December 18, 1971.

**10.** The BLM is the agency within Interior that administers land conveyances under the ANCSA. *See also* 43 C.F.R. § 4.410(a)(4)(b) (1995).

**11.** Although both the T & C and Pub.L. No. 94–204 refer to lands being "subject to" section 12(a) selections, since the laws were drawn up and enacted after the deadline for filing 12(a) selections, references therein to 12(a) selections must refer to selections already made, not future selections.

**12.** The exceptions include selections of federal public lands separated from other public lands by unavailable lands or meandering bodies of water; selections of public lands that would not result in small isolated parcels of available public lands left to the Federal Government after conveyance of selected lands to Native corporations; and selections of public lands that would result in better land ownership patterns or improve land and resource management. 43 U.S.C. § 1611(a)(2)(A).

plaintiff) and is known as the "Village 12(a) Agreement." [13] The Village 12(a) Agreement was incorporated into the second agreement, which was CIRI's agreement with Interior on August 31, 1976, and known as the "CIRI/Interior Deficiency Agreement." These agreements bound the parties to support legislation which would resolve the 12(a) problems by allowing Interior to convey land to CIRI, which, in turn, would reconvey the lands to the Village Corporations.

Plaintiff states that it only entered the Village 12(a) Agreement because CIRI represented that the agreement was necessary to obtain plaintiff's 12(a) selections. Plaintiff insists that the Village 12(a) Agreement did not affect its right to select 12(a) lands located outside the specific areas conveyed to CIRI under the Village 12(a) Agreement. However, defendant maintains that the effect of the two agreements was to limit the lands that Village Corporations could select to those lands listed in Appendix A of the CIRI/Interior Deficiency Agreement (or, if those lands were insufficient, to lands in Appendix C, to be withdrawn only insofar as needed to meet the villages' statutory allotments).

After crafting a solution for the 12(a) selections, CIRI attempted to resolve the 12(b) selections. In early 1978 CIRI requested plaintiff to relinquish its 12(b) selections in the Lake Clark area—pursuant to the Withdrawal, Relinquishment, and Waiver of Selections Agreement—as was necessary under Pub.L. No. 94–204, so that CIRI would receive land in return from Interior. See T & C App. C. ¶ 1, adopted by Pub.L. No. 94–204 § 12(b). On March 20, 1978, plaintiff, CIRI and the other Village Corporations withdrew their appeal with prejudice. See Cook Inlet Region, No. 75–2232. The consequence of these two actions was to cause Public Law No. 94–204 to go into full effect. Plaintiff claims that it did not understand that its actions (relinquishment of land in the Lake Clark area and withdrawal of its lawsuit) would have this effect. Plaintiff further asserts that it never intended for Public Law No. 94–204, or the underlying T & C, to go into operation, because plaintiff objected to this modification and elimination of its original rights under the ANCSA.[14]

In July 1981 the BLM rejected some of plaintiff's 12(b) selections because they were lands conveyed to CIRI, not the Village Corporations, under the T & C. Plaintiff unsuccessfully appealed this decision to the Alaska Native Claims Appeals Board. Seldovia Native Ass'n, Inc., 89 I.D. 74 (1982). In April 1987 the BLM rejected more of plaintiff's 12(b) selections because those lands were listed in Appendix E of the T & C and were available only to Village Corporations as 12(a) selections. Plaintiff appealed, but the IBLA upheld the BLM's 1987 12(b) decision. Seldovia Native Ass'n, Inc., 113 IBLA 218 (1990). Plaintiff proffers that in November 1990 the BLM rejected additional 12(a) selections, explaining that the land requested by plaintiff had not yet been conveyed to CIRI and would not be conveyed to CIRI until CIRI had reconveyed to the Village Corporations all the land already allotted to it.

Finally, in March 1991 plaintiff filed suit in the United States District Court for the District of Alaska against CIRI, Alaska, and Interior. Seldovia Native Ass'n, Inc. v. United States, No. A91–076 (D.Alaska Mar. 11, 1991). Before resolution of the district action, plaintiff filed a complaint in the United States Court of Federal Claims on Febru-

---

13. The full title is ANCSA Section 12(a) Conveyance Agreement Between Cook Inlet Region, Inc., and the Village Corporations of Ninilchik, Knikatnu, Alexander Creek, Salamatoff, Tyonek, Chickaloon and Seldovia.

14. Plaintiff points to a one-sentence typed amendment—uninitialed and unauthenticated—on its Withdrawal, Relinquishment, and Waiver of Selections Agreement from the Lake Clark area that states: "All other 12(b) selections made by Seldovia Native Association, Inc. shall remain valid." It is unclear when this sentence was added, or whether the state or Interior were aware of it at the time. Plaintiff offered no affidavit by a person knowledgeable about its origin. However, it is clear from an examination of the one-page document that this amendment originally was not intended to be included in the agreement, because it was squeezed in at the bottom of the page in a different typeface. Due to plaintiff's failure—other than pointing to a copy of the document with the amendment in one of its own exhibits—to substantiate or authenticate this amendment, the court cannot consider it. See RCFC App. H.

ary 24, 1992. In November 1994 the district court granted defendant's motion for summary judgment in part except for plaintiff's takings claims, which were dismissed without prejudice to allow filing in this court. *Seldovia Native Ass'n, Inc. v. United States,* A91-070 CV (D.Alaska Nov. 2, 1994). Due to the prior filing of the district court action, this court granted defendant's motion to dismiss based on the then-prevailing interpretation of 28 U.S.C. § 1500 (1988). *Seldovia Native Ass'n, Inc. v. United States,* No. 92–130L (Fed.Cl. Sept. 30, 1992) (unpubl.). Plaintiff filed a notice of appeal on November 20, 1992. However, on November 16, 1994, the Federal Circuit granted defendant's unopposed request to remand the case to this court in light of *Loveladies Harbor, Inc. v. United States,* 27 F.3d 1545 (Fed.Cir.1994). *See Seldovia Native Ass'n, Inc. v. United States,* 42 F.3d 1409 (Fed.Cir.1994) (Table).

While the matter was in litigation, Interior continued to act on plaintiff's various remaining 12(a) and 12(b) selections. In August 1992 the BLM rejected a few more 12(b) selections, but this decision was set aside by the IBLA after the BLM indicated that it wished to amend and clarify its decision. In December 1994 the BLM rejected plaintiff's remaining 12(a) selections. As of August 1995, plaintiff asserts that the BLM had yet to act upon the 12(b) selections remanded to it by the IBLA in 1992.

Defendant filed a motion to dismiss, or for summary judgment, on the ground that plaintiff's claims are barred by the statute of limitations. If the claims are ruled to be timely, defendant moved for judgment in its favor on the grounds that plaintiff has no vested property interest in its land selections, that no taking occurred under the Fifth Amendment, and that the court lacks jurisdiction to hear claims based on breach of fiduciary obligations. Plaintiff sought partial summary judgment on the ground that its land selections are legally cognizable property interests protected by the Fifth Amendment and that Interior's actions denying plaintiff's land selections effected a taking and breached Interior's fiduciary duties.

## DISCUSSION

### I. *Takings claims*

#### 1. *Jurisdictional standard*

The statute of limitations is jurisdictional in the Court of Federal Claims. *Henke v. United States,* 60 F.3d 795, 798 (Fed.Cir.1995); *Hart v. United States,* 910 F.2d 815, 817–18 (Fed.Cir.1990); *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271–72, 1 L.Ed.2d 306 (1957). Absent a contrary statutory provision, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). In *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the Supreme Court noted that statutes of limitations "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *Id.* at 117, 100 S.Ct. at 356–57 (quoting *Order of R.R. Telegraphers v. Railway Express Agency,* 321 U.S. 342, 349, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)). Once the Government has met its burden of proof as to the statute of limitations defense, a plaintiff has the burden of proving an exception. *See Duvall v. United States,* 227 Ct.Cl. 642, 652 F.2d 70 (1981).

#### 2. *Summary judgment standard*

A motion for summary judgment should be granted when, as to a particular issue, no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Defendant's motion properly can intercede and prevent trial if the motion demonstrates that trial would be useless because additional evidence, beyond that available in connection with its motion, could not reasonably be expected to change the result. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). "[S]ummary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555; *see also Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd,* 862 F.2d 321 (Fed.Cir.1988) (Table). In considering cross motions for summary judgment, the court is not permitted to weigh evidence. "Summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987) (citations omitted).

### 3. *Statute of limitations*

Ironically, the litigation before the court stems from legislation enacted over 25 years ago with the intent of accomplishing a "settlement of all claims ... rapidly, with certainty ... [and] without litigation." 43 U.S.C. § 1601(a), (b). Despite the fact that the parties have failed to resolve their claims either "rapidly" or "without litigation," the court will do its utmost to ensure that the claims before it are settled "with certainty."

■ A complicated series of statutes and issues clouds the jurisdictional question presented by this case. As the Federal Circuit recently noted, "when resolution of the contested jurisdiction will entail expenditure of significant judicial resources to no avail, it is not inappropriate for an appellate court to simply assume that the losing party would succeed in establishing the contested jurisdiction, and to terminate the litigation on the merits." *Decker & Co. v. West,* 76 F.3d 1573, 1584 (1996). This reasoning is even more apropos at the trial court level. In the case at hand, plaintiff alleges several takings claims to which defendant presents the jurisdictional defenses of the bar of the statute of limitations and lack of subject matter that the Court of Federal Claims can adjudicate. Although the court does not follow the *Decker* approach, in order to address the statute of limitations issue the court must first address the issue of the nature of plaintiff's purported property interests in order to determine when plaintiff's cause of action accrued for statute of limitations purposes.

#### 1) *Nature of plaintiff's property interests*

Plaintiff has alleged a series of constitutional takings claims. Plaintiff claims relief for the modification and diminishment of plaintiff's 12(b) rights under the CIRI/Interior Deficiency Agreements and the enactment of Public Law Nos. 94–204 and 94–456, arguing that they constitute a taking of plaintiff's property by the Government. Plaintiff also claims a taking for the conveyance by the Government to CIRI of lands that plaintiff had selected. Finally, plaintiff's complaint alleges that Public Law Nos. 94–204 and 94–456 diminished its rights under the ANCSA to a full survey of the lands conveyed to plaintiff so as to constitute a taking.

■ The parties debate whether or not plaintiff possessed vested property rights under the ANCSA. This debate misses the point. Plaintiff did have vested rights under the ANCSA—the right to a certain number of acres. Section 1611 states that the Village Corporations.

> shall select, in accordance with rules established by the Secretary, all of the township or townships in which any part of the village is located, plus an area that will make the total selection equal to the acre-

age to which the village is entitled under section 1613 of this title. The selection shall be made from lands withdrawn by section 1610(a) of this title. . . .

43 U.S.C. § 1611. Referring to section 1613, the Village Corporations were allotted a number of acres—not particular lands—depending on the size of their native populations. The statute's provision sets forth the nature of plaintiff's vested property right: "[T]he Secretary shall issue to the Village Corporation a patent to the surface estate in the number of acres shown in the following table." *Id.* at § 1613(a). The table reflects that plaintiff was entitled to 115,200 acres; however, it does not establish a right to any particular acre.

Section 1610(a) sets forth the complicated system by which a Village Corporation's acreage allotment is filled. Not surprisingly, the villages were required to "select" the lands on which they were actually situated as the first step of their entitlement under the ANCSA. The selections were to start at the core of the village and expand out as necessary in what came to be known as "township rings." The first ring of townships comprised "[t]he lands in each township that encloses [sic] all or part of any Native village identified pursuant to subsection (b) of this section." 43 U.S.C. § 1610(a)(1)(A). The second ring of townships comprised "[t]he lands in each township that is [sic] contiguous to or corners on the township that encloses all or part of such Native village; and ... [t]he lands in each township that is [sic] contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection." 43 U.S.C. § 1610(a)(1)(B), (C). In other words, all the statute granted the villages was the land within the village boundaries, along with available connecting lands. It was only if this rather obvious grant was determined to be "insufficient" to fill the acreage allotted by the ANCSA that a Village Corporation would be entitled to more land elsewhere. Section 1610 further provides:

If the Secretary determines that the lands withdrawn by subsections (a)(1) and (2) hereof are insufficient to permit a Village or Regional Corporation to select the acreage it is entitled to select, the Secretary shall withdraw three times the deficiency from the nearest unreserved, vacant and unappropriated public lands.

43 U.S.C. § 1610(a)(3)(A). No provision in the ANCSA conferred on plaintiff a right to any particular acre.[15]

While Public Law Nos. 94–204 and 94–456 altered the pool of lands from which plaintiff was entitled to select, those laws did not alter plaintiff's right to select its full acreage from a pool of land, which was the extent of plaintiff's property right under the ANCSA. Plaintiff had no problem selecting the property on which it was actually situated. Plaintiff's difficulties center around its attempt to fill its statutory allotment of 115,200 acres with tracts of land from other areas. Simply put, plaintiff wanted land that the Government did not offer.

 When plaintiff's first and second ring townships were found to be insufficient to fill the statutory allotment of 115,200 acres, the Secretary withdrew from public lands three times the deficiency from which plaintiff could attempt to fill its allotment. *See* 43 U.S.C. § 1610(a)(3)(A). It is this process (along with the desire to remove the selections of lands in the Lake Clark area) that generated the controversy, when Public Law Nos. 94–204 and 94–456—which ratified the T & C and the agreement CIRI made with Interior and incorporated the agreement CIRI made with plaintiff and other Village Corporations—changed the procedures and the pool of lands from which plaintiff could select. Plaintiff knew, or should have known, the ramifications of its agreement with CIRI. The Village 12(a) Agreement explicitly states:

Both the Cook Inlet Region and the Village Corporations desire a legislative

---

15. The exception to this was the particular land on which the village was actually situated. Under 43 U.S.C. § 1611(a)(1), the village was re-

quired to select "all of the township or townships in which any part of the village is located." However, this lawsuit does not cover these lands.

resolution that shall insure that the Village Corporations receive their statutory entitlement under ANCSA; and ... [both] support the legislation attached as Appendix A to this agreement or a version substantially conforming thereto....

The Village 12(a) Agreement also explicitly states that the lands would be conveyed to CIRI for reconveyance to the Village Corporations. Plaintiff has claimed that it had a right to have these lands conveyed directly to it, but the Village 12(a) Agreement, to which it was a party, expressly states otherwise. Plaintiff's claim that the lands should have been conveyed directly to the Village Corporations is therefore without merit.

As for plaintiff's claim that it did not understand the effect of the various agreements and Public Law Nos. 94–204 and 94–456, one need merely examine a letter dated May 4, 1976, from Fred H. Elvsaas, President of plaintiff Seldovia Native Association, Inc., to Interior. In that letter Mr. Elvsaas states that the various agreements and enactments

> will force the villages to take land that they have previously refused to select— namely, filling the "holes" in the Iniskin Peninsula. If this is so, the legislation means that CIRI will be selecting land for the villages, whereas section 12(b) of the ... [ANCSA] gives the villages the right to select their own lands.

Plaintiff knew the impact of the agreements and was a party to them. The agreements were adopted by Congress in Public Law Nos. 94–204 and 94–456. Plaintiff understood the effect of those laws when they were enacted, and if any taking of property occurred, plaintiff should have filed suit, at the latest, within six years of the operative date of the last of those Acts.

 As for plaintiff's desire for selections in Appendix C to the CIRI/Interior Deficiency Agreement, that agreement states on its first page that CIRI shall be allotted lands listed in Appendix C only "[t]o the extent the lands conveyed pursuant to paragraph [Appendix] A when added to lands otherwise heretofore received or to be received by such Village Corporations are insufficient to satisfy their statutory entitlement." In this manner plaintiff was on notice that it was not entitled to select from Appendix C.

In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements.

*United States v. Locke,* 471 U.S. 84, 108, 105 S.Ct. 1785, 1799–1800, 85 L.Ed.2d 64 (1985) (citing *Texaco, Inc. v. Short,* 454 U.S. 516, 532, 102 S.Ct. 781, 793–94, 70 L.Ed.2d 738 (1982)).

Plaintiff's objections to its loss of selections in the Lake Clark area, pursuant to Public Law No. 94–204, similarly cannot succeed. That plaintiff's representative was present at meetings and apprised of the enactment of Public Law Nos. 94–204 and 94–456 indicates that plaintiff knew or should have known of the existence of those public laws and their effect on plaintiff's Lake Clark selections. *See Locke,* 471 U.S. at 108, 105 S.Ct. at 1799–1800. Pub.L. No. 94–204 states:

> The provisions of this section shall take effect at such time as all of the following have taken place:
>
> (1) the State of Alaska has conveyed or irrevocably obligated itself to convey lands to the United States for exchange, hereby authorized, with the Region in accordance with the document referred to in subsection (b) [the T & C];
>
> (2) the Region and all plaintiffs/appellants have withdrawn from Cook Inlet against Kleppe, numbered 75–2232, ninth circuit, and such proceedings have been dismissed with prejudice; and
>
> (3) all Native village selections under section 12 of the Settlement Act of the lands within Lake Clark, Lake Kontrashibuna, and Mulchatna River deficiency withdrawals have been irrevocably withdrawn and waived.

Pub.L. No. 94–204, § 12(a)(1)–(3), 89 Stat. at 1151. CIRI outlined the effect of fulfilling these conditions quite clearly in its letter of November 30, 1977, to Mr. Elvsaas. Plaintiff knew, or should have known, that when the requirements set forth in Public Law No. 94–204 were met, the provision would become operative and the areas around Lake Clark no longer would be subject to selection. Public Law No. 94–204 was enacted in January 2, 1976, and plaintiff did not meet the final implementing requirements of the law until March 20, 1978. Consequently, plaintiff had two years to familiarize itself with the effect of the law before agreeing to withdraw its lawsuit and its selections around Lake Clark, thereby implementing the Act.

▆ Congress is afforded broad discretion when granting a new right, as it did under the ANCSA. Plaintiff had no prior claim to any lands outside its village, and, even if it did, those claims were extinguished by the ANCSA. 43 U.S.C. § 1603. All the acreage that plaintiff now desires was granted to it by Congress; had there been no ANCSA, plaintiff would have had no more acreage than the extent of its village boundaries in 1970. Congress' decision to change the pool from which plaintiff could select its acreage was hardly unilateral: Extensive discussions and negotiations took place among Interior, Alaska, CIRI, and plaintiff regarding the lands available. Plaintiff was not a party to the T & C, because the T & C involved lands to be conveyed to CIRI as a 12(b) allotment, not lands for plaintiff's 12(a) selections. Thus, plaintiff's position on the sidelines of that agreement was appropriate. Plaintiff was directly involved in the agreements surrounding its 12(a) selections—the Village 12(a) Agreement and the CIRI/Interior Deficiency Agreement. Again, these lands did not involve the first or second rings of land composing plaintiff's actual village and environs, but the pool of lands from which plaintiff could augment its 12(a) selections to garner its full acreage entitlement under the ANCSA. That Congress has the right to condition its grant of a new property interest on reasonable and non-arbitrary conditions is unquestioned. Congress has not

deprived plaintiff of the benefits conferred under the ANCSA by enacting Public Law Nos. 94–204 and 94–456; rather, it merely has chosen to adjust the pool of lands available for selection to enable the creation of a national park and to effect a mutually agreeable compromise with the parties involved.

Plaintiff argues that at the time it filed its selections it acquired a vested property interest in those selections. Defendant counters that the act of selection alone is not enough to acquire a vested property interest in those lands. Defendant points to the fact that a Village Corporation may select more land than it was entitled to and then prioritize those selections. 43 C.F.R. § 2651.4. Accordingly, if plaintiff took advantage of this option, it could not have a vested right in all the land selected, since plaintiff could not acquire all the lands selected or know at the time of selection which lands it actually would receive.

▆ Congress has the power to extinguish property interests it has created if the beneficiaries of the grant do not meet any conditions precedent. *See, e.g., Locke,* 471 U.S. at 84, 105 S.Ct. at 1787 (upholding Congress's broad powers to condition retention of government-granted property interests on fulfillment of reasonable administrative procedures); *Texaco,* 454 U.S. at 516, 102 S.Ct. at 784–85 (constituent to condition retention of state-granted property interest on performance of reasonable actions indicating present intention to retain interest). Conditions that further a legitimate governmental goal are not arbitrary. *Texaco,* 454 U.S. at 529, 102 S.Ct. at 792. "The State surely has the power to condition the ownership of property on compliance with conditions that impose such a slight burden on the owner while providing such clear benefits to the State." *Id.* at 529–30, 102 S.Ct. at 792. It is a legitimate goal of Congress to rid federal lands of stale claims. *Locke,* 471 U.S. at 105–06, 105 S.Ct. at 1798–99. When it is the beneficiary's failure to meet the conditions—not the Government's action that affects the property right granted—no taking is present that requires compensation. *Texaco,* 454 U.S. at 530, 102 S.Ct. at 792–93.

Even with respect to vested property rights, a legislature generally has the power to impose new regulatory constraints on the way in which those rights are used, or to condition their continued retention on performance of certain affirmative duties. As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties.

*Locke*, 471 U.S. at 104, 105 S.Ct. at 1797 (citations omitted). "[L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976) (citations omitted). Moreover, Congress need not compensate erstwhile owners of a property interest for the consequences of their own neglect: "Regulation of property rights does not 'take' private property when an individual's reasonable, investment-backed expectations can continue to be realized as long as he complies with reasonable regulatory restrictions the legislature has imposed." *Locke*, 471 U.S. at 107, 105 S.Ct. at 1799 (citations omitted).

 Section 1613(a) of the ANCSA states: "Immediately after selection by a Village Corporation ... the Secretary shall issue to the Village Corporation a patent to the surface estate." Section 1613(c) is entitled, in part: "Patent requirements; order of conveyance; vesting date." The word "vesting" is not actually used in the text of the section, but the section provides that upon receipt of a patent "the Village Corporation shall first convey to any Native ... title to the surface estate in the tract occupied as of December 18, 1971," thereby implying that this date acts as a retroactive vesting date under section 1613(c)(1). Reading these sections together, the clear implication is that until the patent is granted—*i.e.* until the

12(a) and/or 12(b) selections are approved—there is no vested interest.

 A "patent" is defined as the instrument by which a state or government grants public lands to an individual. *Black's Law Dictionary* 1125 (6th ed. 1990). It has also been defined as the official document issued by the United States attesting that fee title to the land is in the private owner. *Kunkes v. United States*, 78 F.3d 1549, 1551 (Fed.Cir.1996). Until lands are patented, title remains in the United States. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963). In determining the validity of claims against public lands, the Supreme Court has held that

> no right arises from an invalid claim of any kind. All must conform to the law under which they are initiated.... Of course, the land department has no power to strike down any claim arbitrarily, but so long as the legal title remains in the Government it does have power, after proper notice and upon adequate hearing, to determine whether the claim is valid and, if it be found invalid, to declare it null and void.

*Cameron v. United States*, 252 U.S. 450, 460, 40 S.Ct. 410, 412, 64 L.Ed. 659 (1920). Extending this reasoning to the ANCSA, the BLM had the right to determine whether plaintiff's selections were valid and to issue a patent only if the claims were proper. Therefore, until that patent issued, plaintiff had no vested rights in the lands selected.

 The property interest held by Village Corporations, like plaintiff, has been construed to be merely a contingent one, subject to compliance with the settlement scheme outlined in the ANCSA. *See e.g., Cape Fox Corp. v. United States*, 4 Cl.Ct. 223, 236 (1983). If this claim had been timely filed, the court would have found that plaintiff had no vested right in particular lands eligible for compensation under the Fifth Amendment. *Id.*[16] However, as dis-

---

**16.** In reaching this conclusion, the court must stress that it has not weighed the factual evidence in favor of one party or the other. Plaintiff has provided affidavits and deposition excerpts from Mr. Elvsaas, among others, asserting that plaintiff's representatives did not understand the nature and effect of the agreements and

enactments at issue. Plaintiff does not charge fraud, duress, or undue influence. Moreover, the federal statutes and agreements to which plaintiff was a party speak for themselves. When a party voluntarily enters into agreements and abides by certain statutory requirements, the court may conclude, absent compelling evidence to the con-

cussed below, the court has concluded that plaintiff failed to file its claim within the statute of limitations. Consequently, the court lacks jurisdiction and need not rule definitively on the constitutional takings issue. *See Soriano,* 352 U.S. at 270, 77 S.Ct. at 270.

### 2) *Accrual*

▬ In order for jurisdiction to exist in this court over a takings claim, the complaint must be filed within six years of accrual. 28 U.S.C. § 2501. Thus, determination of the date of accrual is of great import. A claim has accrued when operative facts exist that are not inherently unknowable. *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 720–22 (Fed.Cir.1984), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1985). All events necessary to fix the liability of a defendant must have occurred for the plaintiff to have a legal right to maintain his own action. *Creppel v. United States,* 30 Fed.Cl. 323, 329 (1994), *aff'd in part, rev'd in part,* 41 F.3d 627 (Fed.Cir. 1994) (citing *Catawba Indian Tribe v. United States,* 982 F.2d 1564, 1570 (Fed.Cir.), *cert. denied,* 509 U.S. 904, 113 S.Ct. 2995, 125 L.Ed.2d 689 (1993)). A cause of action under the Fifth Amendment accrues when the taking occurs. *Creppel,* 41 F.3d at 633; *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir. 1994).

▬ Plaintiff has suggested that vested rights to land under the ANCSA do not accrue until "completion of the numerous procedural steps mandated in the statutory scheme." *Cape Fox,* 4 Cl.Ct. at 236. This implies that a takings claim could not ripen until all those "numerous procedural steps" have been pursued to their conclusion. Under this interpretation it might appear that plaintiff's 12(b) claims remanded to the BLM in 1992 have not yet ripened, rendering this action premature. However, the IBLA's December 23, 1992 remand order makes clear that those selections involved land conveyed

to the State under Public Law No. 94–456. Because plaintiff is challenging Congress' decision to transfer certain lands to the State, the date for filing such claims would be within six years of the enactment of Public Law No. 94–456. No requirement is present that plaintiff must exhaust administrative remedies before the statute of limitations can begin to run, because no action by the Interior, at any level, can alter the pool of lands made available to plaintiff by Congress.

▬ With respect to statute of limitations issues, "exhaustion [of administrative remedies] is the rule in the vast majority of cases." *Bowen v. City of New York,* 476 U.S. 467, 486, 106 S.Ct. 2022, 2033, 90 L.Ed.2d 462 (1986). Exhaustion of administrative remedies is required where Congress imposes an exhaustion requirement by statute. *See, e.g., Weinberger v. Salfi,* 422 U.S. 749, 766–67, 95 S.Ct. 2457, 2467–68, 45 L.Ed.2d 522 (1975); *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). Where a statutory requirement of exhaustion is not explicit, "courts are guided by congressional intent in determining whether application of the doctrine would be consistent with the statutory scheme." *Patsy v. Board of Regents,* 457 U.S. 496, 502 n. 4, 102 S.Ct. 2557, 2560 n. 4, 73 L.Ed.2d 172 (1982). Moreover, "a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with that intent." *Id.* at 501–502, 102 S.Ct. at 2560.

> [E]xhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Weinberger,* 422 U.S. at 765, 95 S.Ct. at 2467.

Regulations applicable to the ANCSA state that "[a] decision of the Board [of Land Appeals] shall constitute final agency action," and that "[a] petition for reconsideration

trary, that the party understood the nature and consequences of its actions. Plaintiff was on notice of the controlling statutes and does not dispute that it repeatedly was advised of the

effects of its actions. In these circumstances averments of ignorance do not create triable issues.

need not be filed to exhaust administrative remedies." 43 C.F.R. § 4.403 (1995). The conjunction of these two sentences within the same section implies that pursuit of an IBLA decision is required to exhaust administrative remedies. However, because plaintiff is claiming a right to particular lands that Congress denied it through legislation, the basis for plaintiff's takings claim is not an agency taking, but, rather, a taking by congressional enactment. No administrative decision could give plaintiff what Congress has denied. Therefore, the doctrine of administrative exhaustion does not apply in this case. It is Congress that interfered with plaintiff's alleged property interest. As a consequence the statute of limitations began to run, at the latest, from the date that Public Law No. 94-204, became operative, not the date of the exhaustion of administrative remedies.

Plaintiff's takings claims spring from its desire to select lands that Congress, through Public Law Nos. 94-204 and 94-456, made off-limits. Any claim by plaintiff that Congress appropriated its vested rights in specific land selections thus accrued, at the latest, on the day the last of these enactments became operative. Furthermore, as noted above, plaintiff was on notice of the impact of the various provisions. Plaintiff has relied on *Lee v. United States,* 22 Cl.Ct. 457 (1991), *aff'd,* 954 F.2d 735 (Fed.Cir.1992) (Table), to argue that the statute of limitations has not run on its action. In *Lee* a homesteader claimed equitable title to lands transferred to a Native corporation under the ANCSA. The court held that the homesteader could not have brought his claim until the transfer of land to the Native corporation was completed. *Id.* at 462. In that case the homesteader had to wait to see which Native corporation would take legal title to the land on which he was squatting, so the statute of limitations did not begin to run until the transfer. *Id.*

In this case plaintiff did not have to wait for any transfer to occur; plaintiff wanted land that it could not get because of clear and unambiguous agreements and congressional enactments. Plaintiff should have filed suit when Public Law Nos. 94-204 and 94-456 became operative and conveyed to the State and CIRI lands plaintiff wanted. Public Law No. 94-204 became law on January 2, 1976, and became operative on March 20, 1978—when plaintiff complied with its conditions—and Public Law No. 94-456 became law on October 4, 1976. To meet the statute of limitations, plaintiff had to file its claim, at the latest, by March 20, 1984, which it failed to do. Plaintiff's claims are barred by the statute of limitations.[17]

## II. *Breach of fiduciary duty*

In addition to its takings claims, plaintiff also makes several claims that the Government breached fiduciary duties. First, plaintiff claims that the Government breached its fiduciary duty by agreeing to convey to Alaska lands the Government had obligated itself to convey to Seldovia. Second, plaintiff claims that the Government breached its fiduciary duty by modifying and diminishing plaintiff's 12(b) rights by enacting Public Law Nos. 94-204 and 94-456. Third, plaintiff claims that the Government's failure to inform it of changed rights under the new laws also breached its fiduciary duties. Fourth, plaintiff makes a similar charge regarding lands conveyed to CIRI. Fifth, plaintiff alleges a breach of fiduciary duty by the Government's entering into the CIRI/Deficiency Agreement. Finally, plaintiff claims a breach of fiduciary duty by the Secretary's actions pursuant to the CIRI/Deficiency Agreement.

■■■ The Supreme Court in *United States v. Mitchell,* 463 U.S. 206, 226-27, 103 S.Ct. 2961, 2972-73, 77 L.Ed.2d 580 (1983) (known as *Mitchell II* ), outlined two basic requirements which must be met to give rise to federal fiduciary responsibilities: 1) A federal statutory or regulatory scheme imposes certain broad management responsibilities of

---

17. To the extent that plaintiff avers ignorance of the agreements and Acts of Congress, *see supra* note 16, no triable issue is stated with respect to the statute of limitations. Although plaintiff claims that it was ignorant of the effect of the enactments, plaintiff does not allege that the

Government prevented it from ascertaining the effect of the two Acts during the limitations period. In sum, plaintiff proffers no facts that its claims were inherently unknowable due to the vagaries of either the agreements or the legislation.

Indian resources upon the Government, and 2) these management responsibilities require the Government to generate revenue from the Indian resources under management. No express provision in the ANCSA creates a trust or fiduciary relationship between the Government and Village Corporations or Regional Corporations. To the contrary, the first section of the Act establishes that Congress intended to avoid establishing any "wardship or trusteeship" under the ANCSA. 43 U.S.C. § 1601(b). The legislative history shows that the Senate considered and rejected language that would have created such obligations. The Senate Report accompanying the bill stated:

A major purpose of this Committee and the Congress is to avoid perpetuating in Alaska the reservation and the trustee system which has characterized the relationship of the Federal Government to the Indian peoples in the contiguous 48 states.

S.Rep. No. 92–405, 92d Cong., 1st Sess. 108 (1971), U.S.C.C.A.N. at 2192. The House of Representatives rejected a version of the bill which would have had the Secretary holding lands "in trust" for the villages until the villages qualified to receive the patent to the property. See H.R.Conf.Rep. No. 92–746, 92d Cong., 1st Sess. 37 (1971), reprinted in 1971 U.S.C.C.A.N. 2247. A court should not recognize rights under a statute that Congress expressly excluded from the statute. See Gulf Oil Corp. v. Copp Paving Co., Inc., 419 U.S. 186, 200–01, 95 S.Ct. 392, 401–02, 42 L.Ed.2d 378 (1974).

As the Court of Federal Claims has noted, "no provision in [the] ANCSA ... expressly creates a trust or fiduciary relationship between a village corporation and the United States that is to be operative before or after land selection." Cape Fox, 4 Cl.Ct. at 233. Consequently, "[t]here is no indication that Congress in its enactment of the ANCSA intended a fiduciary relationship." Id. Because the ANCSA created no federal fiduciary duties, plaintiff's claims that various actions by the Government breached certain fiduciary duties cannot survive. Defendant consequently is granted summary judgment on those claims in plaintiff's complaint that allege a breach of a fiduciary duty.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted. Plaintiff's cross-motion for partial summary judgment is denied. The Clerk of the Court shall dismiss plaintiff's complaint without prejudice for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

No costs.